[L.A. No. 31911. May 2, 1985.]

THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION,
Plaintiff and Respondent, v.
NAEGELE OUTDOOR ADVERTISING COMPANY OF CALIFORNIA,
INC., Defendant and Appellant.

DESERT OUTDOOR ADVERTISING, INC.,
Plaintiff and Respondent, v.
NAEGELE OUTDOOR ADVERTISING COMPANY OF CALIFORNIA,
INC., Defendant and Appellant.

510

**COUNSEL**

Best, Best & Krieger, Barton C. Gaut, Ronald J. Kohut and Richard Cross for Defendant and Appellant.

Barbara E. Karshmer, Frampton, Karshmer & Kesselman and Art Bunce as Amici Curiae on behalf of Defendant and Appellant.

Robert F. Carlson, Gordon S. Baca, Charles E. Spencer, Jr., William M. McMillan, Ruby A. Theophile, Maxwell, Wright & Wheeler and Sprague Wheeler for Plaintiffs and Respondents.

## OPINION

**GRODIN, J.**—This case presents the question whether the State of California may regulate billboards on Indian reservations. Upon examination of the statutes, legislative history, and precedents involved, we conclude that the state's regulatory authority is preempted by federal law.

This consolidated appeal stems from two separate judgments entered after the trial court granted each plaintiff's motion for summary judgment. Both cases, tried separately below, raise substantially the same issues and involve the same defendant. Because resolution of these issues will have a significant effect on the Morongo Band of Mission Indians, its request to file a brief amicus curiae was granted.

The Morongo Band of Mission Indians (Band) is a federally recognized Indian tribe, and is the beneficial owner of the Morongo Indian Reservation, consisting of approximately 32,300 acres of land located in Riverside County, California. The Morongo Indian Reservation was created by a series of seven executive orders of various Presidents of the United States, one presidential proclamation, one federal statute, and one deed, beginning in 1876 and ending in 1948. Under Patent No. 172786, the United States declared it will hold the said tracts of land ". . . in trust for the sole use and benefit of the said Morongo Band or Village of Indians, according to the laws of California . . . ."

The reservation lies astride a narrow pass between the San Bernardino and San Jacinto Mountain Ranges. As a result only a small portion of the land is located on the plain suitable for economic development. These relatively few acres lie adjacent to Interstate Highway 10, connecting Los Angeles to popular Southern California desert communities.

In addition to the interstate highway, the reservation is crossed by a main line of the Southern Pacific Railroad, the Colorado River Aqueduct, major oil transmission pipelines, natural gas pipelines, and numerous electrical transmission lines, all of which serve the metropolitan Los Angeles area without any significant benefit to the reservation or its residents. The reservation's few natural resources yield little income so that, despite the

Band's apparent advantageous location, its economy is depressed. Many of its members are unemployed and live in poverty.

For many years, the Band has derived a major part of its income from outdoor advertising activities. The Band's general membership has determined that the highest and best use of reservation land adjacent to Interstate 10 is for outdoor advertising. In a 1977 appraisal report, the Southern California Appraisal Office of the Bureau of Indian Affairs came to the same conclusion.

Accordingly, the Band's general membership delegated to its tribal council authority to negotiate agreements for an outdoor advertising business. The Band leased some of this reservation land to non-Indian firms who operated billboards there until 1977. In 1977 the Band solicited proposals for further leases from several non-Indian firms including Naegele Outdoor Advertising Company of California, Inc. (Naegele). Naegele's bid was selected and a lease agreement followed.

Pursuant to title 25 of the United States Code, the Department of the Interior (Interior) must approve such leases before they become effective. (25 U.S.C. § 415.) Upon submission, approval was denied because the lease's purpose, in the Sacramento area director's opinion, would have violated the Highway Beautification Act (23 U.S.C. § 131 et seq.) and California's Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.). The Band appealed this decision and the Interior Board of Indian Affairs reversed. In its opinion, the board concluded that the provisions of the Highway Beautification Act do not apply to Indian reservations and that California's Outdoor Advertising Act cannot be enforced on tribal Indian lands. (*Administrative Appeal of the Morongo Band of Mission Indians* v. *Area Director, Sacramento Area Office* (1979) 86 Interior Dec. 680 (*Admin. Appeal*).)

During the pendency of the Interior appeal, on March 30, 1978, the Band entered into an agency agreement[1] with Naegele. This agreement provided for the installation, construction, operation and maintenance of 15 outdoor advertising structures located on reservation land. On June 27, 1978, the California Department of Transportation (Department) notified Naegele of its intention to apply and enforce California's Outdoor Advertising Act.

---

[1] We take judicial notice of the fact that this agency agreement was approved on or about February 2, 1984, by the Bureau of Indian Affairs.

Despite the Department's warning and the implication that the displays would violate the Outdoor Advertising Act, 16 billboards were erected on reservation land. The state outdoor advertising inspector ultimately issued citations for all 16 displays.

On July 10, 1978, the People of the State of California, acting by and through the Department, filed a complaint and motion for preliminary and permanent injunction against Naegele. The complaint alleged Naegele was in control of 16 outdoor advertising structures located adjacent to Interstate Highway 10 in Riverside County. These structures were in violation of section 5350 of the Business and Professions Code, requiring display permits. Additionally these displays were situated in violation of various provisions of the Outdoor Advertising Act. The Department identified these displays as a public nuisance within the meaning of Business and Professions Code section 5461.

The preliminary injunction was granted on August 1, 1978. And, on November 6, 1981, in accordance with the Department's motion, summary judgment resulted.

The action of Desert Outdoor Advertising, Inc. (Desert), here consolidated with that of the Department, was initially filed on June 26, 1980. In its first amended complaint of December 12, 1980, Desert alleged causes of action for nuisance, unfair competition, intentional interference with prospective economic benefit and negligent interference with prospective economic benefit. Naegele's demurrer was sustained as to the nuisance cause of action. The court dismissed both causes of action for interference and granted Desert's motion for summary judgment on the unfair competition cause of action. In its order the court enjoined Naegele from maintaining advertising structures on the reservation without complying with the Outdoor Advertising Act. Naegele was ordered to remove all noncomplying structures. The enforcement of this judgment was stayed pending appeal.

The question we must answer on appeal is whether the Department can, through the Outdoor Advertising Act, regulate billboards erected on reservation land held in trust by the United States for the beneficial use of the Band. This inquiry requires us to consider several subsidiary questions.

In 1832, Chief Justice Marshall opined, with enviable clarity, that Indian tribes were wholly distinct nations within whose boundaries "the laws of [a State] can have no force." (*Worcester* v. *Georgia* (1832) 31 U.S. (6 Pet.) 515, 561 [8 L.Ed. 483, 501].) In the interim, however, the United States Supreme Court has departed from this view and acknowledged certain lim-

itations upon tribal sovereignty. For example, " '[t]he sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and *is subject to complete defeasance.'* " (*Rice* v. *Rehner* (1983) 463 U.S. 713 [77 L.Ed.2d 961, 970, 103 S.Ct. 3291, 3295], quoting *United States* v. *Wheeler* (1978) 435 U.S. 313, 323 [55 L.Ed.2d 303, 313, 98 S.Ct. 1079], with added italics.)

It is apparent that Congress may delegate its power over the governance of Indian reservations to the states. The Department argues that, in the context of outdoor advertising, Congress has done so through the Highway Beautification Act.

The Highway Beautification Act of 1965 was enacted to provide for scenic development and road beautification of the federal-aid highway systems. Title I of the act (23 U.S.C. § 131) contains requirements for the control of outdoor advertising.

In general, the act seeks to eliminate outdoor advertising displays within 660 feet of the edge of any interstate or federal primary system highway. Toward this end, the act mandates a 10 percent cut in federal-aid highway funds to any state which fails to provide for "effective control" over the erection and maintenance of such displays. (23 U.S.C. § 131(b).)

Title 23 United States Code section 131(c) explains that "effective control" means that, with five specified content-based exceptions none of which apply in this case, all such displays shall be banned.[2]

The act clearly contemplates that the states will achieve compliance through their inherent powers of zoning and condemnation. (23 U.S.C. § 131(d)-(g).) The act also provides that, at the states' option, advertising displays may be permitted within 660 feet of interstate and federal highways within areas zoned industrial or commercial under state law. (23 U.S.C. § 131(d).)

---

[2]The act limits the content of such devices to five acceptable categories. Loosely defined, they are: (1) signs advertising scenic attractions, (2) signs advertising sale or lease of property upon which displays are located, (3) signs advertising activities conducted on the property on which displays are located, (4) landmark signs, and (5) signs advertising the distribution of free coffee to travelers. The signs in category 1 are to conform to standards regulating size, spacing, etc. "to be promulgated by the Secretary." (23 U.S.C. § 131(c).)

At the time of the enactment of the Highway Beautification Act in 1965, "the Secretary" was the Secretary of Commerce; in 1966 Congress created the Department of Transportation and all powers and duties under this act were transferred to the Secretary of Transportation. (Pub. L. No. 89-670 (Oct. 15, 1966) 80 Stat. 931.)

California complies with the Highway Beautification Act through its Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.). This act explicitly recognizes that outdoor advertising is a legitimate commercial use of property adjacent to roads and highways and provides that such advertising "should be allowed to exist in business areas." (*Id.*, § 5226.) The act also provides, however, that it is the policy of the state "to promote the public safety, health, welfare, convenience and enjoyment of public travel, to protect the public investment in such highways, to preserve the scenic beauty of lands bordering on such highways, and to insure that information in the specific interest of the traveling public is presented safely and effectively . . . ." (*Ibid.*)

The act then provides for restrictions upon outdoor advertising consonant with the provisions of the Highway Beautification Act. For example, outdoor advertisers must obtain permits before placing displays within 660 feet of the right-of-way of interstate and primary highways. (Bus. & Prof. Code, § 5350.) The content of allowable displays within this area is limited to the same categories as specified by the Highway Beautification Act. (*Id.*, § 5405.) Finally, certain safety measures involving size, spacing, and location are imposed. (*Id.*, §§ 5403, 5405, 5408.)

The Department contends that it may enforce the provisions of the Outdoor Advertising Act on Indian reservations because Congress expressly delegated such enforcement authority to the states through the Highway Beautification Act. Naegele and the Band, on the other hand, argue that this is a misinterpretation of the federal law.

Subdivision (h) of the federal act provides: "All public lands or reservations of the United States which are adjacent to any portion of the Interstate System and the primary system shall be controlled in accordance with the provisions of this section and the national standards promulgated by the Secretary." According to the Department, this provision clearly expresses Congress's intention to include Indian reservations under the provisions of the Highway Beautification Act and to give states the authority to enforce the act's provisions on Indian reservations.

Naegele and the Band argue that the phrase "public lands or reservations of the United States" was not intended to include Indian reservations. They find support for this view in the opinion of the Interior Board of Indian Appeals. (*Admin. Appeal, supra,* 86 Interior Dec. 680.) The board examined the statute, concluded that it was ambiguous, and interpreted its ambiguities in favor of the Indians. On this basis it concluded that Congress

did not intend the Highway Beautification Act to apply to Indian reservations.

The board's interpretation of the Highway Beautification Act is debatable (see *United States* v. *Portneuf-Marsh Valley Irr. Co.* (E.D. Idaho 1913) 205 Fed. 416, 419, affd. (9th Cir. 1914) 213 F. 601, 603) but we need not resolve that debate here. Even assuming that the act was intended to apply to Indian reservations, it does not follow that Congress has authorized *state enforcement* of the act on such reservations, or indeed on any federal lands.

Several years before the enactment of the Highway Beautification Act, Congress made an earlier attempt to regulate outdoor advertising adjacent to federally funded highways. In 1958, Public Law No. 85-767 (72 Stats. 885, former 23 U.S.C. § 131) established standards similar to those of the later act and similarly relied upon the states for enforcement. This legislation provided that states which agreed to comply with federal outdoor advertising standards would be entitled to a one-half of 1 percent bonus in federal highway funding. The section of this law applicable to federal lands read: "Whenever any portion of the Interstate System is located upon or adjacent to any public lands or reservations of the United States, *the Secretary of Commerce may make such arrangements and enter into such agreements with the agency having jurisdiction over such lands or reservations as may be necessary to carry out the national policy . . . ,* and any such agency is authorized and directed to cooperate fully with the Secretary of Commerce in this connection." (*Id.,* § 131(d), italics added.)

Thus the 1958 law clearly did not grant the states authority to enforce highway beautification provisions on federal lands and reservations. Rather, enforcement authority was reserved to the federal agencies having jurisdiction over such lands.

Desert argues that the fact that Congress did not repeat this language in the 1965 act is a clear indication that it wished to transfer enforcement authority over "public lands and reservations" from the federal agencies "having jurisdiction over such lands and reservations" to the states. We do not find this argument persuasive.

The House Report summarizing the legislative intent of the Highway Beautification Act states "[section h] simply extends to all public lands and reservations of the United States which are adjacent to any portion of the Interstate System or the primary system *the same controls* covering other roads which are subject to this legislation." (1965 U.S. Code Cong. & Admin. News, p. 3717 (89th Cong., 1st Sess.), italics added.) This sum-

mary description could indicate that Congress intended to maintain the same enforcement mechanism it had developed in the 1958 law. Thus, the act's standards (or "controls") would apply to all public lands and reservations of the United States. But, while the states would enforce these controls on state-owned and on private lands through their zoning and condemnation authority, federal agencies would enforce the controls on federal lands through their independent statutory authority over such lands.

Administrative and judicial interpretations of the Highway Beautification Act support this view.[3] In 1970, the Secretary of the Interior promulgated regulations for the issuance of permits for outdoor advertising on public lands under the jurisdiction of the Bureau of Land Management. (Former 43 C.F.R. § 2921.0-6.)[4] These regulations effectively prohibited the issuance of permits for outdoor advertising which would not have complied with the standards of the Highway Beautification Act.

In 1977, the Ninth Circuit upheld these Interior Department regulations against a challenge mounted by an outdoor advertising company in Nevada which asserted, inter alia, that Interior's authority to regulate in this area had been preempted by the Highway Beautification Act. (*Ryan Outdoor Advertising, Inc.* v. *U.S.* (9th Cir. 1977) 559 F.2d 554.) The court noted that Interior's authority to administer the laws dealing with federal lands was both well established and "almost plenary." "The fact that Congress has authorized the [federal] Department of Transportation to *set general standards* on outdoor advertising which apply to public lands as well as to private does not preempt continued regulation of the same public lands by the Secretary of the Interior. . . . [¶] There is simply no indication that Congress intended in the Highway Beautification Act the significant alteration of a persuasive, well-established regulatory scheme. . . ." (*Id.,* at p. 556, italics added.)

In addition, recent precedents in other contexts establish that congressional authorization of state regulation on federal property will be found

---

[3]The earliest administrative interpretation of the act of which we are aware is a memorandum opinion from the Associate Solicitor for Indian Affairs to the Commissioner of Indian Affairs, Department of the Interior, dated April 7, 1967. This opinion is consistent with our interpretation. Although the opinion concluded that Indian reservations "are subject to regulation under the [Highway Beautification] [A]ct," it did not address the issue of state authority to enforce the act's provisions on federally owned lands and did not suggest that state enforcement had been authorized by Congress.

[4]These regulations, specifically directed toward the issuance of permits for outdoor advertising, disappeared in a general reorganization and renumbering of the regulations which occurred in 1981. The new regulations, which discuss the leasing of public lands in more general terms, make no specific mention of outdoor advertising. (46 Fed. Reg. 5777 (Jan. 19, 1981) 43 C.F.R. § 2920.0-1 et seq.)

only where Congress's mandate is explicit. In a pair of cases, the United States Supreme Court has considered the question whether federal statutes mandating state pollution control legislation have the effect of subjecting federal installations and activities located within the states to state regulation. The court concluded that "[b]ecause of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent that there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of state regulation 'clear and unambiguous.'" (*Hancock* v. *Train* (1976) 426 U.S. 167, 179 [48 L.Ed.2d 555, 565, 96 S.Ct. 2006], fns. omitted; see also *EPA* v. *State Water Resources Control Board* (1976) 426 U.S. 200 [48 L.Ed. 578, 96 S.Ct. 2022].) These cases suggest that congressional authorization of state regulatory action on reservation land held in trust by the United States for the beneficial use of reservation Indians should require a similarly clear and unambiguous mandate.[5] We discern no such explicit mandate in the Highway Beautification Act.

Further, as noted above, the Highway Beautification Act contemplates that the states will achieve compliance through the use of their inherent powers of zoning and eminent domain. ■ Yet tribally owned Indian reservation land is not subject to state powers of eminent domain (*Minnesota* v. *United States* (1939) 305 U.S. 382 [83 L.Ed.2d 235, 59 S.Ct. 292]; *United States* v. *10.69 Acres of Land* (9th Cir. 1970) 425 F.2d 317), and states are not authorized to enforce their land-use regulations on Indian reservations (*Santa Rosa Band of Indians* v. *Kings County* (9th Cir. 1975) 532 F.2d 655, cert. den. (1977) 429 U.S. 1038 [50 L.Ed.2d 748, 97 S.Ct. 731]). ■ Additionally, Indian tribes are immune from suit in the absence of an effective waiver or consent. (*Puyallup Tribe* v. *Washington Game Dept.* (1977) 433 U.S. 165, 172 [53 L.Ed.2d 667, 674, 97 S.Ct. 2616].) The Supreme Court has held that, while Congress can authorize suits against Indian Nations, a waiver of sovereign immunity cannot be implied but must be unequivocally expressed. (*Santa Clara Pueblo* v. *Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 115, 98 S.Ct. 1670].)[6]

---

[5]See also *State of Washington* v. *Environmental Protection Agency* (9th Cir. 1985) 752 F.2d 1465 (CA No. 83-7763) upholding the EPA's conclusion that the federal Resource Conservation and Recovery Act (RCRA), title 42 United States Code section 6901 et seq., "does not give the state jurisdiction over Indian lands, and that states could possess such jurisdiction only through an express act of Congress or by treaty" even though Indian tribes are clearly regulated entities under RCRA and the act authorizes state regulation in lieu of the federal program.

[6]In *Santa Clara Pueblo, supra,* 436 U.S. 49, the United States Supreme Court held that Congress's action in enacting the Indian Civil Rights Act of 1968 (25 U.S.C. §§ 1301-1303) which, in relevant part, provides that "[n]o Indian tribe in exercising powers of self-gov-

■ It appears logically imperative that, had Congress intended the states to enforce the provisions of the Highway Beautification Act against nonconforming advertising displays located on Indian tribal lands, it would have empowered the relevant state authorities to condemn reservation lands, to regulate tribal land use, and to sue Indian tribes. No such authorization can be found in the Highway Beautification Act.

We therefore conclude that, even if Congress intended the outdoor advertising standards of the Highway Beautification Act to apply on Indian reservations, it did not intend that these standards be enforced through the assertion of state power. Thus, we reject the Department's argument that the Highway Beautification Act authorizes state regulation of outdoor advertising on Indian reservation lands.

■ Both the Department and Desert argue alternatively that the act of August 15, 1953 (Pub. L. No. 83-280, 67 Stat. 589 (commonly known as Public Law 280)) confers upon the State of California the authority to enforce its Outdoor Advertising Act on Indian reservation lands. This position is untenable.

Although section 4 of Public Law 280, codified at 28 United States Code section 1360, appears to provide that all state laws of general application are effective on Indian reservations within the specified states,[7] the law has not been so construed by the federal courts. In *Bryan* v. *Itasca County* (1976) 426 U.S. 373 [48 L.Ed.2d 710, 96 S.Ct. 2102], the Supreme Court, reasoning that "the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court" (*id.*, at p. 385 [48 L.Ed.2d at p. 719]), concluded that Public Law 280 did not give Minnesota the authority to tax the personal property of Indians living on a reservation. More recently, the Ninth Circuit concluded that Public Law 280 does not authorize the enforcement of state and county laws controlling the conduct of bingo games on Indian reservations in California. (*Barona Group of Capitan Grande Band, etc.* v. *Duffy* (9th Cir. 1982) 694 F.2d

---

ernment shall . . . deny to any person within its jurisdiction the equal protection of its laws" (§ 1302(8)), could not be interpreted as an implicit waiver of the tribes' immunity from suit. The court concluded that such a waiver requires an "unequivocal expression of . . . legislative intent. . . ." (*Santa Clara Pueblo, supra,* 436 U.S. at p. 59 [56 L.Ed.2d at p. 115].)

[7]Section 4(a), as codified at 28 United States Code section 1360(a) (1976), provides: "(a) Each of the States . . . listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over other civil causes of action, and those civil laws of such State . . . that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . .: . . . . California . . . . All Indian country within the State."

1185.) The court noted: "The Supreme Court . . . has construed [section 4] to mean that states have jurisdiction *only* over private civil litigation involving reservation Indians in state court. [Citation.] Thus a state may not impose general civil/regulatory laws on the reservation." (*Id.*, at pp. 1187-1188, italics added.) Neither Desert nor the Department advances any convincing argument why we should diverge from the *Barona* court's conclusion. We therefore conclude that state enforcement of the Outdoor Advertising Act on Indian reservations is not authorized by Public Law 280.[8]

For these reasons we determine that Congress has not authorized state regulation of outdoor advertising on Indian reservations. This does not end our inquiry, however.

The United States Supreme Court has observed that under certain circumstances a state may validly assert authority over on-reservation activities even in the absence of a congressional mandate to do so. (*New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324, 331-332 [76 L.Ed.2d 611, 618-619, 103 S.Ct. 2378, 2384-2385].) It may be argued that this is such a case.

The Department cites *Rice* v. *Rehner* (1983) 463 U.S. 713 [77 L.Ed.2d 961, 103 S.Ct. 3291], *Puyallup Tribe* v. *Washington Game Dept.* (1977) 433 U.S. 165 [53 L.Ed.2d 667, 97 S.Ct. 2616], and *Mescalero Apache Tribe* v. *Jones* (1973) 411 U.S. 145 [36 L.Ed.2d 114, 93 S.Ct. 1267], among others, as examples of cases in which state regulation of Indian activities has been found permissible. But these cases are inapposite.

In *Rice* v. *Rehner,* the court found that Congress had expressly provided for the application of state law. (*Rice, supra,* 463 U.S. 713, 732-733 [77 L.Ed.2d 961, 978, 103 S.Ct. 3291, 3302].) In *Mescalero Apache Tribe* v. *Jones* and *Puyallup Tribe* v. *Washington Game Dept.,* the court scrutinized pertinent federal law and discerned no intent to preempt state authority. The situation is quite different here.

More than 10 years ago, the Supreme Court noted that, in the area of state regulation of tribal enterprises, generalizations have become treach-

---

[8]The Department also appears to argue that the Secretary of the Interior's notice supplementing 25 Code of Federal Regulations section 1.4, published at 30 Federal Register 8722 (July 2, 1965), provides an independent basis for its assertion of state regulatory authority over Indian lands. This notice, however, specifically provides: "Nothing contained in this notice shall be construed to in any way alter or limit the provisions of [Public Law 280]." In light of this proviso, we are satisfied that the Secretary's directive is merely an attempt to interpret the aims of Congress in enacting Public Law 280. As such, it should not be construed to endow the state with broader general regulatory authority over Indian lands than mandated by the congressional enactment.

erous. Nonetheless, amid the welter of decisions analyzing preemption in this unique context, the Supreme Court has recently reaffirmed that "a State will certainly be without jurisdiction if its authority is pre-empted under familiar principles of pre-emption . . . ." (*New Mexico, supra,* 462 U.S. at pp. 333-334 [76 L.Ed.2d at p. 620, 103 S.Ct. at p. 2386]. See also *People* v. *McCovey* (1984) 36 Cal.3d 517, 525 [205 Cal.Rptr. 643, 685 P.2d 687].)

Among these "familiar principles" is the following. ■ Whether federal legislation preempts state law "is a matter of legislative intent. In ascertaining this intent, . . . the test . . . is whether the enforcement of state law would conflict with the purposes of the federal legislation, whether by frustrating an affirmative federal purpose or by interfering with a matter intentionally left unregulated by Congress." (*Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 591 [39 L.Ed.2d 708, 394 P.2d 548].)

■ The Highway Beautification Act clearly represents Congress's intent to design a comprehensive scheme for the regulation of outdoor advertising adjacent to federal highways throughout the United States. In Interior's view, Congress intended to leave Indian reservation lands entirely unregulated under the act. In our opinion, Congress may have intended the act's provisions to apply on Indian reservations. But if so, it reserved to federal authorities the responsibility for enforcing the act's provisions upon federal lands and reservations. In either case, the assertion of state regulatory authority in this area would clearly conflict with Congress's purposes, either by subjecting Indian enterprises exempt from control under the federal act to state regulation, or by imposing inconsistent state regulations in an area reserved for federal oversight.[9]

For this reason, we conclude that the state's regulatory authority in this area is preempted by the operation of federal law and the judgment in favor of the Department must be reversed.[10]

---

[9]Interior's authority to supervise the enterprise at issue here cannot be doubted. Under 25 United States Code section 415(a) Indian lands may be leased for business purposes only "with the approval of the Secretary of the Interior." In accordance with this statutory authorization, the Secretary has issued extensive regulations pertinent to the leasing of Indian lands. (25 C.F.R. § 162 et seq.)

The record amply indicates that the Band's outdoor advertising enterprise has been encouraged and approved by the Bureau of Indian Affairs. By contrast the Department has presented evidence that every one of the sixteen advertising displays involved here is in violation of substantive provisions of state law.

[10]With all due respect to our concurring colleague, we see little resemblance between this case and *In re Wilson* (1981) 30 Cal.3d 21 [177 Cal.Rptr. 336, 634 P.2d 363], except for the fact that both involve Indians. The question in *Wilson* was "whether extinguishment of the [Pit River] tribe's Indian title to, or right to occupy, their aboriginal territory operated to extinguish the tribe's aboriginal hunting rights." (*Id.,* at p. 24.) No issue pertaining to regulation of activity on reservations, or of federal preemption, was involved.

■ Desert's judgment on the complaint of unfair competition must also be reversed.[11] This action is premised upon the language of Business and Professions Code section 17200 which defines "unfair competition" to include any "unlawful" business practice. Desert admits that if Naegele's conduct is not forbidden by law, there is no unfair competition. We have concluded that California law cannot be applied to regulate the billboards at issue. And, even if Naegele's conduct could somehow be construed as violative of federal law, state court injunctive relief under the theory of unfair competition is inappropriate.

A similar question was raised in *Diaz* v. *Kay-Dix Ranch* (1970) 9 Cal.App.3d 588 [88 Cal.Rptr. 443]. In that case, plaintiff migratory farmworkers sought an injunction prohibiting defendant ranch owners from knowingly employing illegal aliens. An action alleging unfair competition was brought under former Civil Code section 3369.

The court, while recognizing the farmworkers' need for protection, denied injunctive relief on the basis that federal action through the authority of the Immigration and Naturalization Service would be more efficacious than injunctive relief. "Plaintiffs seek the aid of equity because the national government has breached the commitment implied by national . . . policy. It is more orderly, more effectual, less burdensome to the affected interests, that the national government redeem its commitment. Thus the court of equity withholds its aid." (*Diaz, supra,* at p. 599.)

As discussed above, it is unclear whether the provisions of the Highway Beautification Act were intended to apply to outdoor advertising on Indian reservations at all. Even if this question were resolved in Desert's favor, however, we have concluded that Interior, rather than the Department, is the appropriate agency to enforce the act's provisions. The sound counsel of the *Diaz* decision, therefore, mandates state abstention in reliance upon federal enforcement in this case.

The summary judgments are reversed.[12]

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

---

[11]Desert initially filed a cross-appeal as to its three other causes of action. This cross-appeal was dismissed at Desert's request on March 8, 1983.

[12]Because we base our conclusion on grounds of federal preemption, we need not resolve the issue whether, as Naegele asserts, the lawsuits against it should be dismissed pursuant to Code of Civil Procedure section 389 on the basis that the Band is a necessary party which cannot be joined.

**MOSK, J.**—I concur in the majority opinion.

In doing so, however, I wonder about the appearance of consistency when the court defers to *federal* control of Indian lands in a case involving billboards, after holding that traditional Indian hunting and fishing rights must yield to *state* control in a case involving fish and game laws. (*In re Wilson* (1981) 30 Cal.3d 21 [177 Cal.Rptr. 336, 634 P.2d 363]; but see dis. opn. by Mosk, J., and Newman, J., at p. 37 ff.)

To offer a more convincing rationale in the instant matter, and to provide a recognizable pattern in the law, we should take this opportunity to overrule *Wilson*.

The petition of respondent Department of Transportation for a rehearing was denied July 10, 1985, and the opinion was modified to read as printed above.