[No. B067045. Second Dist., Div. One. Nov. 2, 1992.]

ADA SOLORZANO et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FAMILY HEALTH PLAN, INC., Real Party in Interest.

## COUNSEL

Kurt Eggert, Morrison & Foerster, Joseph C. Markowitz, Tamara L. Joseph and Richard W. Grime for Petitioners.

Thomas S. Sayles, Alan S. Weinger, George A. Crawford and Nicholas Lanza as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Rushfeldt, Shelley & Drake, Randall L. Shelley, Stacy Raphael, Greines, Martin, Stein & Richland and Timothy T. Coates for Real Party in Interest.

## OPINION

**VOGEL, J.**—Ada Solorzano, America Rodriguez and Dolores Morales sued Family Health Plan, Inc. (FHP) for damages and injunctive relief, asserting violations of several California statutes arising from FHP's allegedly unfair and misleading advertising practices in soliciting subscribers for its "Senior Plan," a coordinated care plan designed for Medicare beneficiaries. The question before us is whether the federal statute regulating Medicare-qualified health maintenance organizations (HMO's) preempts the field and deprives the states of jurisdiction to grant injunctive relief to these and other individuals dissatisfied with the manner in which an HMO solicits and enrolls Medicare recipients. Our answer is that it does not.

### FACTS

Plaintiffs, each of whom receives Medicare and Medi-Cal benefits, were visited at home by FHP's agents, urged to enroll in FHP's Senior Plan, and assured they could continue to be treated by their non-FHP physicians for a "nominal" additional charge. All three plaintiffs enrolled and agreed to assign their Medicare and Medi-Cal benefits to FHP. To their dismay, they

discovered that, contrary to the agents' representations, treatment by non-FHP physicians was not covered except for emergency care provided outside FHP's service area and the only covered services were those offered by FHP's own physicians and affiliated hospitals. They discovered the problem when their own doctors turned them away or billed them in full for noncovered services.

Plaintiffs disenrolled and filed this action, asking for injunctive relief to stop FHP's alleged unfair competition, deceptive trade practices and deceptive advertising. In addition, Plaintiffs sought general and punitive damages on common law theories of fraud and intentional infliction of emotional distress. FHP demurred to Plaintiffs' first amended complaint, moved to strike the punitive damage claims and moved for judgment on the pleadings against the causes of action seeking injunctive relief. The trial court overruled the demurrer and denied both motions, and FHP petitioned for a writ of mandate (*Family Health Plan, Inc.* v. *Superior Court* (Feb. 3, 1992) B064462 [nonpub. opn.]) compelling the trial court to grant the motion for judgment on the pleadings on preemption grounds. Although at that stage we were undecided about the merits of FHP's claims, we recognized the need for an early determination of the question and therefore issued an alternative writ which, unfortunately, used the historically correct but currently confusing command to the trial court to either vacate its order denying the motion for judgment on the pleadings or show cause why it should not be ordered to do so.

The trial court took us literally, vacated its order and entered a new order granting the motion. We, in turn, dismissed FHP's petition as moot. Not surprisingly, Plaintiffs then filed this petition for a writ of mandate to compel the trial court to reinstate its original order denying the motion for judgment on the pleadings. This time we issued an order to show cause instead of an alternative writ.[1]

### DISCUSSION

Plaintiffs contend their injunctive relief claims are not preempted by federal law. We agree.

---

[1]Contrary to popular belief, we sometimes issue *Palma* notices (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893]), alternative writs and orders to show cause not because we have made up our minds that the petition ought to be granted but because we perceive a genuine dispute and want to hear the other side of the story.

## A.

### FEDERAL PREEMPTION

**(1)** Congressional intent, whether explicitly stated or implicitly contained in the structure or purpose of a statute, determines whether a law of the United States preempts regulation by the states of the same subject matter. (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. __ [120 L.Ed.2d 407, 422-423, 112 S.Ct. 2608]; *Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 613-614, 97 S.Ct. 1305].) In the absence of an express congressional command, state law is preempted (1) if it actually conflicts with federal law or (2) if federal law so thoroughly occupies a legislative field by a pervasive and complex regulatory system as to make reasonable the inference that Congress left no room for the states to supplement it. (*Fidelity Federal Sav. & Loan Assn.* v. *De La Cuesta* (1982) 458 U.S. 141, 153 [73 L.Ed.2d 664, 675, 102 S.Ct. 3014].) Everyone agrees there is no express preemption in this case.

Where, as here, Congress regulates a field historically within the police powers of the states (public health), the party asserting preemption must establish "that preemption was the 'clear and manifest purpose of Congress.'" (*Pennsylvania Medical Soc.* v. *Marconis* (3d Cir. 1991) 942 F.2d 842, 846, quoting *Pacific Gas & Elec.* v. *Energy Resources Comm'n.* (1983) 461 U.S. 190, 206 [75 L.Ed.2d 752, 766, 103 S.Ct. 1713]; see also *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].) To meet this burden, FHP claims congressional intent to preempt California's regulation of HMO marketing practices is implicit in the Health Care Financing Administration's (HCFA) pervasive regulation of the manner in which HMO's solicit and enroll Medicare-eligible beneficiaries. Alternatively, FHP claims a potential conflict exists between federal regulation of HMO marketing practices and state regulation of the same activities.[2]

---

[2]In the trial court and in its initial papers filed here, FHP did not assert preemption as a defense to Plaintiffs' common law damage claims but only to their claims for injunctive relief. While this case was pending, the United States Supreme Court clarified a previously murky issue by holding in *Cipollone* v. *Liggett Group, Inc., supra,* 505 U.S. __ [120 L.Ed.2d 407, 112 S.Ct. 2608], that, for purposes of preemption analysis, the phrase "state law" includes common law claims, statutes and regulations. Because we conclude that the federal laws before us do not preclude state regulation of HMO's, it is in any event irrelevant whether Plaintiffs are seeking injunctive relief or damages.

And although FHP originally argued that the statute authorizing appropriations for Medi-Cal (42 U.S.C. § 1396 et seq.) also preempts the field, this position has been abandoned, perhaps because Medi-Cal is a joint state and federal program expressly subject to state regulation. (See, e.g., 42 U.S.C. § 1396b(q)(3).)

### B.

### Medicare and Coordinated Care Plans

Medicare is a two-part federal health insurance program for people 65 or older and certain disabled people. (42 U.S.C. § 1395 et seq.) Part A helps pay for inpatient hospital care (42 U.S.C. § 1395c et seq.) and part B helps pay for physicians' services and other outpatient care (42 U.S.C. § 1395j et seq.). Part A benefits are available to most people without payment of a premium but a monthly premium ($31.80 in 1992) is charged for part B benefits. Both parts have deductibles and coinsurance provisions (noncovered amounts which the beneficiary must pay personally or through other insurance).

Most Medicare beneficiaries receive medical care through the traditional "fee-for-service" delivery system. These people consult private physicians and use private hospitals, and bills for services rendered are sent by the healthcare providers to Medicare for payment. Medicare determines whether it will pay all or part of the fee (rates of reimbursement are based on the particular medical procedure and the geographic area in which the services are rendered) and any noncovered balance (including any deductible) is the patient's responsibility.[3] Some services are not covered at all (such as routine physical examinations, eyeglasses, etc.) and are entirely the responsibility of the Medicare beneficiary. Privately purchased "medigap" insurance plans afford coverage for deductibles, copayments and excluded expenses for Medicare beneficiaries using a fee-for-service delivery system.

A growing segment of the population has switched from the fee-for-service system to coordinated care plans—prepaid, managed care plans, most of which are HMO's or competitive medical plans (CMP's).[4] HMO's provide or arrange for all Medicare covered services, generally charging fixed monthly premiums and small copayments and frequently offering benefits not covered by Medicare for little or no additional cost. The major difference between receiving care from a private physician on a pay-as-you-go basis and receiving care from an HMO is that an HMO charges the

---

[3] The practice of billing Medicare beneficiaries for that portion of fees not reimbursed by Medicare is commonly known as "balance billing" and is the subject of regulation in many states. (See *Pennsylvania Medical Soc.* v. *Marconis, supra,* 942 F.2d 842; *Massachusetts Medical Soc.* v. *Dukakis* (1st Cir. 1987) 815 F.2d 790.)

[4] Although they are creatures of different statutes and regulations and have distinguishing features (e.g., in the manner in which benefits are delivered, the manner and timing of payments, and the amount of out-of-pocket payments required), HMO's and CMP's are generally referred to in the literature collectively as HMO's. FHP is an HMO, not a CMP but, insofar as we can tell, there are no differences relevant to the preemption issue before us.

patient a basic premium covering virtually all medical care rendered by physicians, hospitals and other health care providers employed by or affiliated with the HMO.[5] (See "The Medicare 1992 Handbook," published by HCFA and available through the Consumer Information Center, Department 59, Pueblo, Colorado 81009; see also "Medicare and Coordinated Care Plans," HCFA Publication No. 02195 (1991).)

An HMO may contract with HCFA to provide services to Medicare beneficiaries. Unlike the private physician who bills Medicare directly for each individual procedure performed on each patient, a contracting HMO receives reimbursement from HCFA on a "capitation" basis—in simple terms, this means the HMO's reimbursement rate is calculated on a per capita basis, with a flat rate paid for each individual enrolled in the plan during a particular time period. The rate is calculated by an actuarial projection taking into account the expenses historically paid for a given category of Medicare beneficiaries in a given geographical area on a traditional fee-for-service basis, with the rate varying widely depending upon the location of the HMO. Once the rate is set, HCFA pays 95 percent of the rate to the HMO.[6] It follows that it is to the government's benefit to encourage Medicare beneficiaries to participate in an HMO, since Medicare ends up paying only 95 percent of what it typically would pay for the same services rendered on a fee-for-service basis. Other savings to the government result from the streamlined reimbursement plan and elimination of individual claim processing costs. (See 42 U.S.C. § 1395mm.)

## C.

### THE FEDERAL STATUTES

As noted at the outset, there is no express preemption statement in the Medicare statute. ██ ██ ██ As will now appear, neither is there an implicit expression of congressional intent to preempt state regulation of marketing efforts directed at Medicare beneficiaries.[7]

In general terms, section 1395 of title 42 of the United States Code prohibits federal interference with the practice of medicine, the manner in

---

[5]This is referred to as a "lock-in" requirement because (subject to exceptions for emergency treatment) the patient is "locked in" to receiving care from HMO affiliated physicians and facilities.

[6]HMO's are not eleemosynary organizations. Although Medicare patients account for only 33 percent of FHP's enrollees, 62 percent of its 1991 profit came from its contract with HCFA.

[7]FHP does not contend the Medicare statute preempts all state regulation of every aspect of the Medicare program. Instead, FHP focuses solely on the conduct condemned by Plaintiffs' complaint and asserts that marketing practices cannot be subjected to state regulation by an "unfocused, ad hoc request for injunctive relief in the sort of civil lawsuit asserted [by these Plaintiffs]." This rather myopic view of the issue incorrectly assumes that the identity of the

which medical services are provided, the hiring practices of institutions and agencies providing health services and the administration and operation of such institutions. (See *Massachusetts Medical Soc.* v. *Dukakis, supra,* 815 F.2d at p. 791 [construing 42 U.S.C. § 1395 as explicitly stating an intent to minimize federal intrusion into the area of medical services for the elderly and holding that state regulation of balance billing is not preempted]; see also *Pennsylvania Medical Soc.* v. *Marconis, supra,* 942 F.2d at p. 846, fn. 4.)

More specifically, section 1395mm of title 42 of the United States Code addresses the interaction between Medicare and private medical plans, including HMO's, by giving HCFA authority to prescribe procedures and conditions under which an HMO may inform and enroll Medicare beneficiaries. The same section prohibits the distribution of brochures, application forms and other promotional materials to or for eligible individuals unless the materials have been submitted to the Secretary of the Department of Health and Human Resources for review and approval.[8] In the exercise of his discretion, the Secretary must disapprove materials which are materially inaccurate or misleading or which otherwise make a material misrepresentation. (42 U.S.C. § 1395mm(c)(3)(C).) At the time of enrollment and at least annually thereafter, each enrollee must be advised of his or her rights to benefits from the HMO, the restrictions on payments for services furnished other than by or through the HMO, out-of-area coverage provided by the HMO, the coverage available for emergency services and urgently needed care, and appeal rights. (42 U.S.C. § 1395mm(c)(3)(E).)

If HCFA determines that an HMO has misrepresented or falsified information furnished to any individual, the Secretary may provide, "in addition to any other remedies authorized by law," for specified civil money penalties, for a suspension of the HMO's enrollment of individuals, and for a suspension of payment to the HMO. (42 U.S.C. § 1395mm(i)(6)(A), (7)(B).)

### D.

### THE FEDERAL REGULATIONS

Regulations implementing 42 United States Code section 1395mm are set out in title 42 of the Code of Federal Regulations, section 417.100 et seq.,

---

plaintiff is relevant to the preemption analysis. It is not, and FHP cites no authority suggesting that it is. On the other hand, it is possible for Congress to preempt one area (but not others) of a federally regulated field (*Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238, 249-256 [78 L.Ed.2d 443, 452-458, 104 S.Ct. 615]; *Pacific Gas & Elec.* v. *Energy Resources Comm'n., supra,* 461 U.S. at pp. 205, 211-212 [75 L.Ed.2d at pp. 765-766, 769-770]) and we therefore accept FHP's "marketing practices" limitation of the area at issue in this case.

[8]HCFA, which is headed by a "Director," operates under the umbrella of the Department of Health and Human Services (HHS), which is headed by a "Secretary." (See 42 C.F.R. § 417.100.)

and enrollment procedures are covered by 42 Code of Federal Regulations, section 417.223. Among other things, these regulations require an HMO to provide to interested persons the HMO's rules and regulations regarding membership; an adequate written description of the HMO's basic benefit package and available supplemental benefit packages; the liability of an enrollee for deductible and coinsurance amounts, noncovered services and out-of-plan services; enrollment eligibility and procedures; and such other information (e.g., hours of operation) as may be necessary for the beneficiary to make an informed decision about whether to enroll in the HMO. (42 C.F.R. § 417.223(c) (1).) Subdivision (c)(2) of section 417.223 requires an HMO to submit "all brochures, applications, and promotional and informational material which deal with enrollment of health insurance program beneficiaries with the HMO, to the [HCFA] for approval prior to issuance."

Subdivision (d) of section 417.223 of the Code of Federal Regulations lists proscribed marketing activities. "The HMO may not engage in any of the following activities in marketing its plan to health insurance program beneficiaries: [¶] (1) Practices which are discriminatory or unethical in nature; [¶] (2) Activities which would mislead, misinform, confuse, or defraud health insurance program beneficiaries, or misrepresent the HMO, its marketing representatives, or the [HCFA], such as claims that the HMO is recommended or endorsed by the [HCFA] (other than that the organization is approved as an HMO for purposes of participation in the health insurance program . . .), or claims that the [HCFA] recommends that the beneficiary enroll in the HMO or deceptive door-to-door solicitation; [¶] (3) Offers of gifts or payment as an inducement to enroll in the HMO (this does not proscribe the explanation of any legitimate benefits the beneficiary might obtain as an HMO enrollee, such as eligibility to enroll in a supplemental benefit plan which covers such items as deductibles and coinsurance, preventive services, etc.); and [¶] (4) Promises, claims, or other statements, written or oral, which conflict with, materially alter, or erroneously expand upon the information contained in the marketing materials approved by the Secretary."

E.

## THE HMO/CMP MANUAL

The "Health Maintenance Organization/Competitive Medical Plan Manual" is published by HCFA to provide "instructions for implementation of the provisions of Medicare law and regulations particularly as they relate to

[HMO] benefits." (Manual, Forward, § B(1).)[9] Among other things, the manual covers marketing by HMO's. After defining "medicare required marketing activities" (open enrollment periods, etc.), and before identifying in detail the permitted and required content of preenrollment marketing materials, the manual explains to the HMO's that "[y]our HMO/CMP member rules cannot conflict with Medicare rules. *You also must meet all State (and local) requirements for marketing activities (e.g., State licensure and in some States, review of marketing material)*." (Manual, § 2201, italics added.)

F.

THE STATE STATUTES

1. *The Health Care Service Plan Act*

Without regard to the identity of enrollees as Medicare recipients or otherwise, California's Department of Corporations regulates HMO's under the Knox-Keene Health Care Service Plan Act of 1975, sections 1340 et seq. of the Health and Safety Code.[10]

The Health Care Service Plan Act is intended, among other things, to ensure that enrollees are informed of available benefits and services to enable a rational consumer choice in the marketplace and to prevent fraudulent solicitations, deceptive advertising and misrepresentations in the enrollment process. (Health & Saf. Code, § 1342, subds. (b), (c).) To this end, the act requires that plans be licensed (Health & Saf. Code, § 1349), that they disclose their financial records to the Commissioner of Corporations (Health & Saf. Code, § 1351.1), and that specified fees be paid to cover costs and expenses of administering the act (Health & Saf. Code, § 1356). Detailed provisions cover persons and firms engaged in the solicitation of enrollees (Health & Saf. Code, § 1359), solicitation materials (Health & Saf.

---

[9]The manual lodged by the parties was revised most recently in July 1992. It is HCFA publication No. 75 and is available through the National Technical Information Service of the United States Department of Commerce, Springfield, Virginia.

[10]A "health care service plan" is any person or organization "who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for such services, in return for a prepaid or periodic charge paid by or on behalf of such subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f).) FHP admits it is a "health care service plan" within the meaning of subdivision (f) of section 1345.

Code, § 1360), advertising (Health & Saf. Code, § 1361) and disclosure forms (Health & Saf. Code, § 1363).[11]

By its express terms, the Health Care Service Plan Act applies to plans accepting Medicare beneficiaries as enrollees. (Health & Saf. Code, §§ 1367.12, 1367.15; Cal. Code Regs., tit. 10, §§ 1300.67.50-1300.67.55.) Without any exclusions for Medicare-qualified HMO's, the act permits the Commissioner of Corporations to suspend or revoke a plan's license for a violation of the act (Health & Saf. Code, § 1386), to sue for civil penalties of up to $2,500 for each violation (Health & Saf. Code, § 1387), to issue cease-and-desist orders (Health & Saf. Code, § 1391), to seek injunctive relief (Health & Saf. Code, § 1392) and to seek involuntary dissolution of the plan (Health & Saf. Code, §§ 1394.1-1394.3). A person who willfully violates the act is subject to criminal prosecution. (Health & Saf. Code, § 1390.)

Plaintiffs' requests for injunctive relief are not based on the Health Care Service Plan Act and the act is relevant only insofar as it helps us understand the interaction between the state and federal governments in regulating HMO's. FHP has not attacked the Commissioner of Corporations' right to enforce the Health Care Service Plan Act against FHP (for illegal marketing practices or otherwise) but has, as noted above, limited its attack to a private party's civil suit for injunctive relief. From our perspective, we have a conceptual problem with FHP's position in light of its express admission that it is covered by the act and its tacit admission that the *Medi-Cal* statute expressly permits state regulation—taken together, these concessions mean the Commissioner of Corporations could seek injunctive relief and civil penalties against FHP for the very conduct complained of by Plaintiffs but that Plaintiffs cannot seek injunctive relief and can only sue for damages. We reject the temptation to dispose of the issue on this basis and address the preemption issue on the merits.

---

[11]Definitions are given for written and oral statements that are untrue (Health & Saf. Code, § 1360, subd. (a)(1)), misleading (Health & Saf. Code, § 1360, subd. (a)(2)), and deceptive (Health & Saf. Code, § 1360, subd. (a)(3)). A representation that a plan is sponsored, recommended or approved by the Commissioner of Corporations is prohibited (Health & Saf. Code, § 1360.1) and, subject to limited exceptions, all advertising materials must be filed with the Commissioner prior to distribution (Health & Saf. Code, § 1361). Detailed disclosure statements (benefits, exceptions, limitations, full premium costs, deductibles, copayment requirements, etc.) are required (Health & Saf. Code, § 1363) and deceptive names are prohibited (Health & Saf. Code, § 1366).

The disclosure statement must include a section captioned "Choice of Physicians and Providers" and must include "a description of the nature, extent and circumstances under which choice is permitted. This section shall include, if applicable, a subcaption 'Liability of Subscriber or Enrollee for Payment' followed by a description of the financial liability which is, or may be, incurred by the subscriber, enrollee or a third party by reason of the exercise of such choice." (Cal. Code Regs., tit. 10, § 1300.63(a)(9).)

## 2. *Injunctions Prohibiting Unfair Trade Practices*

Plaintiffs' complaint alleges a right to injunctive relief on the basis of three state statutes. The first, section 17200 of the Business and Professions Code, prohibits unlawful, unfair and fraudulent business practices and unfair, deceptive, untrue and misleading advertising. The second, section 17500 of the Business and Professions Code, makes it unlawful for any person or entity to induce someone to enter a contract by disseminating untrue or misleading information. The third, section 1770 of the Civil Code, prohibits deceptive practices in consumer transactions. These statutes are the bases of FHP's assertion that Plaintiffs' "ad hoc" requests for injunctions prohibiting misleading comments about FHP's lock-in provisions are "unfocused."

## G.

### THE FIELD HAS NOT BEEN PREEMPTED

## 1. *Federal Regulation Is Not Pervasive*

Plaintiffs contend the federal statute and regulations are not pervasive and do not sufficiently occupy the field to displace state regulation of FHP's marketing practices. We agree.

As our review of the federal law (pts. B, C, D and E, *ante*) reflects, the statute and regulations are neither extensive nor particularly detailed and there is ample room for the states to fill in gaps in the regulatory scheme. This is true not only with regard to a Medicare-qualified HMO's marketing practices, but to Medicare regulations generally and, for this reason, the courts have consistently rejected arguments that other parts of the federal Medicare regulations are sufficiently pervasive to preclude state regulation. (See, e.g., *Massachusetts Medical Soc.* v. *Dukakis, supra*, 815 F.2d 790; *Pennsylvania Medical Soc.* v. *Marconis, supra*, 942 F.2d 842.)[12]

Even if the federal Medicare statute is viewed as "comprehensive," that fact does not persuade in favor of preemption (*Hillsborough County* v. *Automated Medical Labs., Inc.* (1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 723-724, 105 S.Ct. 2371]) where, as here, Congress has expressed an intent

---

[12]Indeed, the Medicare statute and its ancillary regulations are far more detailed, specific and complex in the area of fees and billing practices than in the area of marketing. At least two courts have nevertheless permitted state regulation of Medicare billing practices, rejecting preemption arguments virtually identical to those asserted by FHP. (*Pennsylvania Medical Soc.* v. *Marconis, supra*, 942 F.2d 842; *Massachusetts Medical Soc.* v. *Dukakis, supra*, 815 F.2d at pp. 792-794.)

to minimize federal intrusion into the administration of the Medicare program (42 U.S.C. § 1395) and where, as here, the subject of regulation (public health) is a matter traditionally left to the police powers of the states. (*Pennsylvania Medical Soc.* v. *Marconis, supra,* 942 F.2d at p. 846; *Massachusetts Medical Soc.* v. *Dukakis, supra,* 815 F.2d at p. 795 ["a state is ordinarily as concerned as the federal government to see that its elderly citizens enjoy medical care"]; *Pacific Gas & Elec.* v. *Energy Resources Comm'n., supra,* 461 U.S. at p. 206 [75 L.Ed.2d at pp. 766-767].)

When Congress intends to fully occupy a field to the exclusion of state regulation, it knows how to do so. (*Jones* v. *Rath Packing Co., supra,* 430 U.S. at pp. 530-532 [51 L.Ed.2d at pp. 616-618]; *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230-236 [91 L.Ed. 1447, 1459-1462, 67 S.Ct. 1146].) That is not what it did here and it is clear that preemption of marketing practices was not intended. As HCFA explains in its HMO/CMP manual (see fn. 9, *ante*), an HMO soliciting Medicare beneficiaries must meet all state and local requirements for marketing activities. HCFA has construed the federal law in the only logical fashion—against preemption and in favor of joint regulation with the states, to ensure that the elderly and infirm are not victimized by deceptive advertising practices. The Department of Corporations shares this view and has filed an amicus curiae brief asserting its right to regulate FHP under the Health Care Service Plan Act (Health & Saf. Code, § 1340 et seq.) and providing examples of enforcement actions it has pursued against other Medicare-qualified health care plans without objection on preemption grounds. While we do not find persuasive another HMO's failure to raise the preemption issue, we do consider it significant that both HCFA and the state interpret the federal statute to permit state regulation. (*Mudd* v. *McColgan* (1947) 30 Cal.2d 463, 470 [183 P.2d 10].)

### 2. *Federal Law Does Not Conflict With State Law*

FHP contends state court injunctive relief potentially conflicts with federal regulation of an HMO's marketing practices because California *might* impose a penalty greater than any of those available under the federal regulations. We disagree.

First, a state's imposition of a stiffer penalty or a higher standard of care than mandated by federal law does not preclude state regulation. (*California* v. *ARC America Corp.* (1989) 490 U.S. 93, 105 [104 L.Ed.2d 86, 97, 109 S.Ct. 1661] ["state causes of action are not preempted solely because they impose liability over and above that authorized by federal law"]; *Silkwood* v. *Kerr-McGee Corp., supra,* 464 U.S. at pp. 257-258 [78 L.Ed.2d at pp. 458-459] [punitive damage award 10 times greater than allowable federal

fine upheld against federally licensed nuclear plant operator].) Second, the conflict requiring preemption is a conflict between state and federal law which arises when "compliance with both federal and state regulations is a physical impossibility" (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 257, 83 S.Ct. 1210]; see also *Hillsborough County* v. *Automated Medical Labs., Inc., supra,* 471 U.S. at pp. 715-716 [85 L.Ed.2d 714, 722-723]) or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 587, 61 S.Ct. 399]).[13] Neither condition is present here, and mere speculation about a hypothetical conflict is not the stuff of which preemption is made. (*Younger* v. *Jensen* (1980) 26 Cal.3d 397, 408-409 [161 Cal.Rptr. 905, 605 P.2d 813]; *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 130-131 [57 L.Ed.2d 91, 102-104, 98 S.Ct. 2207].).

Our review of the federal statute, regulations and operating manual on the one hand, and of Plaintiffs' complaint and the California statutes and regulations on the other, reveals no conflict, present or potential. Indeed, the federal and state regulatory schemes are strikingly similar, consistently parallel systems working together to prevent the very practices Plaintiffs allege—misrepresentations about the lock-in provisions of FHP's Senior Plan.[14]

### 3. *Congress Did Not Intend to Preempt the Field*

Another persuasive argument against preemption is the fact that, at the time of the most recent (1990) amendments to the Medicare marketing statute (42 U.S.C. § 1395mm(i)(6)(A) [the penalty provision]), Congress presumably was aware of the fact that some states (including California) had

---

[13]In each of the cases relied upon by FHP, simultaneous compliance with state and federal regulations was a physical impossibility. (*Fidelity Federal Sav. & Loan Assn.* v. *De La Cuesta, supra,* 458 U.S. 141; *Jones* v. *Rath Packing Co., supra,* 430 U.S. 519; *Franklin Nat. Bank* v. *New York* (1954) 347 U.S. 373 [98 L.Ed. 767, 74 S.Ct. 550].)

[14]We cannot take seriously FHP's claim that an injunction might prevent the continued marketing of its Senior Plan in its present form. To justify an injunction restraining sales of that plan, the trial court would have to be satisfied that the plan itself was misleading, deceptive or otherwise prohibited. If it is, it should be enjoined. If it is not, it will not be.

Relying on *Diaz* v. *Kay-Dix Ranch* (1970) 9 Cal.App.3d 588 [88 Cal.Rptr. 443] and *People ex rel. Dept. of Transportation* v. *Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509 [213 Cal.Rptr. 247, 698 P.2d 150], FHP also contends the mere existence of a federal regulatory scheme makes state injunctive relief inappropriate under general principles of equity. The cases are inapposite because, unlike the case at bench, both deal with fields absolutely and entirely preempted by federal law (immigration and Indian affairs).

statutes restricting the marketing practice of HMO's.[15] Congress nevertheless did not include a specific preemption provision in the 1990 amendment to 42 United States Code section 1395mm. As the Supreme Court explained in *California Federal Sav. & Loan Assn.* v. *Guerra* (1987) 479 U.S. 272, 287-288 [93 L.Ed.2d 613, 627-628, 107 S.Ct. 683], when Congress remains silent regarding the preemptive effect of its legislation on state laws it knows to exist at the time it passes such legislation, Congress has failed to express an intent to supersede those state laws. (See also *Pennsylvania Medical Soc.* v. *Marconis, supra,* 942 F.2d at p. 850.)

### DISPOSITION

Congress clearly recognized the need for state and local assistance in regulating the marketing of HMO's and other supplemental health care packages to the elderly and disabled and, quite the opposite of intending preemption, appears to have intended a call to the states (and private parties) for all the help it can get. Accordingly, Plaintiffs' petition for writ of mandate is granted. Let a writ issue directing the trial court to vacate its April 29, 1992, order granting FHP's motion for judgment on the pleadings and to reinstate its order of January 7, 1992, overruling FHP's demurrer to the first amended complaint and denying FHP's motion for judgment on the pleadings.

Spencer, P. J., and Ortega, J., concurred.

On December 1, 1992, the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied February 11, 1993.

---

[15]California's Health Care Service Plan Act was enacted in 1975. (Stats. 1975, ch. 941, § 2, p. 2071.)