[No. B140639. Second Dist., Div. One. Feb. 28, 2001.]

CONGRESS OF CALIFORNIA SENIORS et al., Plaintiffs and Appellants, v.
CATHOLIC HEALTHCARE WEST et al., Defendants and Respondents.

492

**COUNSEL**

Carol R. Golubock and Andrew L. Strom for Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Barry S. Landsberg, Terri D. Keville and Ileana M. Hernandez for Defendants and Respondents.

## OPINION

VOGEL (Miriam A.), J.—Hospitals, doctors and others who provide services to Medicare beneficiaries are reimbursed based in part upon annual cost reports filed by the providers to conform to the Medicare statute and a variety of federal rules and regulations. Those cost reports are at the heart of this case, in which the primary plaintiff is a union and the primary defendant is a hospital at which there appears to be an ongoing effort to unionize the hospital's employees. The union claims the hospital has included in its annual cost reports certain "anti-union" expenses that the union says are not allowable under federal law. For relief, the union wants a declaration that the hospital's conduct constitutes an unfair business practice within the meaning of section 17200 of the Business and Professions Code, an accounting of the hospital's "expenditures on activities to influence employees regarding unionization and of the impact of such expenditures on payments received" by the hospital under the Medicare program, and an injunction compelling the hospital to disgorge all money it has acquired by means of any unlawful business practice.

The issue is preemption. Our conclusion is that the field of Medicare provider cost reporting and reimbursement is so fully and completely occupied by federal law—as our unfortunately lengthy discussion of the pertinent statutes, regulations, manuals and other rules will show—that there remains no room for state action. We affirm the trial court's judgment of dismissal.

### FACTS

The Congress of California Seniors, the Service Employees International Union, and two of the Union's locals (collectively, the Union) sued Catholic Healthcare West and related medical organizations (collectively, CHW), alleging violations of Business and Professions Code section 17200.[1] The Union alleges that both "the Medicare and the Medi-Cal programs impose upon providers of medical services detailed cost reporting requirements. Under the Medicare program, hospitals . . . are required to submit annual reports . . . includ[ing] information on patient revenues, operating expenses by classification, patient days, and number of Medicare patient days. The reports are a necessary component of claims for payment under the program.

---

[1]All references to "section 17200" are to that section of the Business and Professions Code.

The Medi-Cal program requires the submission of similar cost reports." Since any costs incurred for activities directly related to influencing employees with regard to unionization may not be included in determining reasonable costs, "a provider is under an obligation when reporting costs of providing services under the Medicare and Medi-Cal programs to exclude the costs of such activities from the reasonable operating costs reported."

According to the Union, CHW has for the past several years "engaged in activities to deter unionization by [its] employees" and, in the process, has incurred considerable costs, including "a share of the salaries and benefits paid to supervisory employees for time spent in their employer's anti-unionization activities; a share of the salaries and benefits paid to non-supervisory employees for time spent attending meetings and other activities arranged by [CHW] to influence them regarding unionization; payment to consultants who have been retained by [CHW] to plan and direct [its] anti-unionization activities; the costs of preparing, producing, and disseminating communications to employees in an effort to influence them regarding unionization; attorneys fees for planning and defending [CHW] in proceedings brought by governmental agencies with regard to [CHW's] illegal activities in [its] efforts to influence employees regarding unionization." According to the Union, CHW has failed to exclude the "considerable costs" it incurred "in activities to influence employees regarding unionization" from its calculation of its reasonable and allowable costs on its cost reports.

In five causes of action, the Union alleges that CHW's activities are unlawful, unfair or fraudulent, all in violation of section 17200. In its prayer, the Union asks for a declaration that CHW's conduct violates the law, an "*accounting . . . of all expenditures on activities to influence employees regarding unionization and of the impact of such expenditures on payments received under the Medicare and [Medi-Cal] programs and from private health plans,*" injunctions (1) prohibiting CHW from "refusing to disgorge all monies which [it] acquired by means of any" unlawful business practice, (2) prohibiting CHW from "refusing to amend [its] Medicare and Medi-Cal cost reports to exclude the costs of their anti-unionization activities from allowable costs," and (3) "*refusing to correctly report*" its costs in the future, and attorneys' fees. (Italics added.)

CHW removed the case to federal court, contending there that the Union's claims are preempted by the False Claims Act, 41 United States Code section 3729 et seq. The district court rejected the removal and remanded the case to superior court. CHW then demurred, contending (among other

things) that the Union's claims are preempted by the Medicare and Medi-Cal statutes, the National Labor Relations Act, and the Federal False Claims Act. The demurrers were sustained *with* leave to amend but the Union elected to stand on its complaint and a judgment of dismissal was entered. At the same time, at CHW's request, the trial court issued a protective order to prohibit disclosure of "all information received during the discovery process in this matter." The Union appeals.

DISCUSSION

I.

We agree with the Union that section 17200 prohibits any business act or practice that is unlawful, unfair or fraudulent, and we agree that the Union need not be personally aggrieved to sue under section 17200. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 567 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) We assume, as we must because this case is before us at the demurrer stage, that the Union has alleged conduct that could be unlawful, unfair or fraudulent. (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173].) But it does not follow that the Union can pursue its Medicare-based claims under section 17200—because the Union's attack on CHW's cost reporting and the resulting reimbursement to CHW is preempted by federal law.

A.

In the absence of an express congressional command, state law is preempted (1) if it actually conflicts with federal law or (2) if federal law so thoroughly occupies a legislative field by a pervasive and complex regulatory system as to make reasonable the inference that Congress left no room for the states to supplement it. (*Solorzano v. Superior Court* (1992) 10 Cal.App.4th 1135, 1139 [13 Cal.Rptr.2d 161]; see also *Smiley v. Citibank* (1995) 11 Cal.4th 138, 147 [44 Cal.Rptr.2d 441, 900 P.2d 690].) Since there is no express preemption in the Medicare statute (*Solorzano v. Superior Court, supra,* 10 Cal.App.4th at p. 1141), and since our conclusion makes it unnecessary to separately consider whether there is an actual conflict, the question before us is whether federal law has occupied the field of Medicare reimbursement sufficiently to exclude the state. (*Ball v. GTE Mobilnet of California* (2000) 81 Cal.App.4th 529, 537 [96 Cal.Rptr.2d 801].)

The Union contends our analysis must start with a presumption of non-preemption. We disagree. "[A]n 'assumption' of nonpre-emption is not

triggered when the State regulates in an area where there has been a history of significant federal presence." (*United States v. Locke* (2000) 529 U.S. 89, 108 [120 S.Ct. 1135, 1147, 146 L.Ed.2d 69].) Put more plainly, there is no presumption one way or the other where, as with Medicare, there is a history of significant federal presence in the field. But the fact that public health is a field historically within the police powers of the states means the party asserting preemption must establish that preemption was the " 'clear and manifest purpose of Congress.' " (*Solorzano v. Superior Court, supra,* 10 Cal.App.4th at p. 1139.) To meet that burden, CHW claims congressional intent to preempt California's regulation of Medicare reimbursement to healthcare providers is implicit in the statutes and regulations governing how and by whom Medicare reasonable cost reimbursement and recoupment decisions must be made. We agree.[2]

### B.

### 1.

Medicare, established by the 1966 adoption of title XVIII of the Social Security Act, provides basic and supplementary health insurance to individuals age 65 and older and to other qualifying individuals. (42 U.S.C. §§ 1395c, 1395j.) The Medicare program is governed and administered by the Health Care Financing Administration (HCFA) of the Department of Health and Human Services (HHS). (*Bowen v. Georgetown University Hospital* (1988) 488 U.S. 204, 205-206 [109 S.Ct. 468, 470-471, 470-471, 102 L.Ed.2d 493] [Congress has authorized the Secretary of HHS to promulgate regulations setting limits on the levels of Medicare costs that will be reimbursed].) The program has three components, each financed differently and each offering a distinct type of beneficiary coverage: Part A covers institutional health services; Part B covers outpatient services rendered by physicians and other professionals; Part C, adopted by the 1997 Balanced Budget Act, is a relatively new program providing an elective private health care plan for Medicare beneficiaries.

---

[2]In *Solorzano,* we held that Congress did not intend to preempt state regulation of *marketing efforts directed at Medicare beneficiaries,* no more and no less. (*Solorzano v. Superior Court, supra,* 10 Cal.App.4th at p. 1141.) In *Solorzano,* the relevant federal regulations expressly required compliance with all state and local requirements for marketing activities. (*Id.* at p. 1147.) In this case, we address an integral part of the Medicare program, not an ancillary issue. Other courts have held that other parts of the Medicare program preempt state claims (e.g., *Cox v. Shalala* (4th Cir. 1997) 112 F.3d 151, 154-155; *Smith v. Travelers Indem. Co.* (M.D.Fla. 1989) 763 F.Supp. 554, 557-558), but there is no reported decision addressing the preemption issue with regard to provider cost reporting and reimbursement.

Part A providers' claims for reimbursement are processed by companies called fiscal intermediaries, which are usually commercial insurance companies operating under contracts with the Secretary of HHS. (*Your Home Visiting Nurse Services, Inc. v. Shalala* (1999) 525 U.S. 449, 451 [119 S.Ct. 930, 932-933, 142 L.Ed.2d 919]; *Good Samaritan Hospital v. Shalala* (1993) 508 U.S. 402, 404 [113 S.Ct. 2151, 2154, 124 L.Ed.2d 368].) Part B professional and supplier claims are processed by entities called carriers, but they too are commercial insurance companies. Intermediaries and carriers not only process claims, but also have some responsibility for making coverage and payment decisions. (See Jost, *Governing Medicare* (1999) 51 Admin. L.Rev. 39, 44; hereafter Jost; Epstein, Fundamentals of Health Law, Overview of Medicare and Medicaid Reimbursement Issues (2000) pp. 7-9; hereafter *Fundamentals*; see also 3 Medicare and Medicaid Guide (CCH 2000) ¶¶ 13,310, 13,320, pp. 5345-5359-20.)[3]

2.

Before 1983, hospitals were paid by Medicare on a retrospective cost basis and increases in provider operating expenses were passed on to the federal government. Spiraling health care costs prompted a complete reformulation of the methodology, and the Prospective Payment System (PPS), adopted by Congress in 1983, is the result. (*Fundamentals, supra*, p. 41.)[4] In general terms, providers are now reimbursed for their "reasonable costs" according to the PPS methodology, by a cost-based methodology, by a fee schedule, or by some combination of those approaches. (42 U.S.C. §§ 1395d, 1395k, 1395h, 1395x; *Fundamentals, supra*, pp. 41-60.)

Under PPS, nonexempt hospitals are paid for inpatient services (prospectively, as the name suggests) based upon a predetermined flat rate calculated with reference to the patient's diagnosis at discharge and the hospital's costs. Nationally established diagnosis related groups (DRG's, which group diseases by diagnosis and assign them into case types that take into consideration the resources needed to treat the condition) and major diagnostic

---

[3]As Professor Jost notes, "[t]he Medicare program is, by any definition, massive. Its 1997 budget of $194.26 billion represented almost twelve percent of the national budget, the fourth largest federal program after Social Security, defense, and interest on the national debt. Medicare's 38.1 million beneficiaries include about fourteen percent of the nation's population. The Medicare program purchases services for its beneficiaries from 6,376 inpatient hospitals, 13,444 skilled nursing facilities, 8,437 home health agencies, 1,927 hospices, 787,513 physicians and other practitioners, 454 managed care plans, and thousands of other entities." (Jost, *supra*, p. 40.)

[4]The idea is that "institutions will not be disadvantaged, as they sometimes are under other arrangements, by having to put up money for the purchase of goods and services well before they receive reimbursement." (42 C.F.R. § 413.5(b)(1) (1999).)

categories (MDC's, into which the DRG's are organized) form the basis for the PPS calculation. (*Fundamentals, supra*, p. 43.) The PPS rate may exceed the hospital's actual costs for treating the patient—or it may not cover them, in which event any costs incurred in excess of the PPS rate are absorbed by the hospital. (42 C.F.R. § 412; *Fundamentals, supra*, pp. 41-42.)[5]

In general terms, this is how it works: When a PPS hospital submits a claim for payment for inpatient care provided to a Medicare beneficiary, a DRG is assigned. The DRG "weight" (a figure representing the average resources required to care for that group relative to the average resources used to treat all DRG's) is then multiplied by a dollar amount based on the average Medicare-allowable operating cost per discharge (the standardized amount, which is the sum of labor and nonlabor costs) for that year. (42 U.S.C. § 1395ww(d); *Fundamentals, supra*, pp. 46-47.) The labor component of the standardized amount, in turn, is adjusted by the wage index to account for variations in area hospital labor costs; the nonlabor component is determined by the hospital's classification as an urban or rural provider. (*Id.* at p. 47.)

Adjustments may be made to the standardized amount based upon the type of hospital making the claim, the kinds of cases it treats, and other factors. Sole community hospitals, Medicare-dependent, small rural hospitals, and others may be eligible for special payments under PPS (42 C.F.R. § 412.90), and additional payments are available to hospitals that serve a disproportionate share of low-income patients. (42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. §§ 412.2(f)(6), 412.106, 412.320.) Teaching hospitals receive additional payments through indirect medical education adjustments for inpatient operating and capital-related costs. (42 C.F.R. § 412.105; *Fundamentals, supra*, p. 48.)

For each claim submitted, a notice of program reimbursement (NPR) is issued to the provider to explain the provider's total allowable costs and the amount of the PPS payment. (*Fundamentals, supra*, p. 46.) There is a similar but distinct PPS applied to claims based on outpatient services. (*Id.* at pp.

---

[5]The objective is that costs with respect to individuals covered by Medicare will not be borne by those not covered, while the costs for individuals not covered will not be borne by Medicare. (42 C.F.R. § 413.5(a).) Because the intent of the Medicare program is to reimburse providers for the actual costs of services furnished, providers will be reimbursed on the basis of actual costs, even though they may vary from provider to provider. Implicit in the intention that actual program costs be paid, to the extent they are reasonable, is the expectation that the provider will seek to minimize its costs and that its actual costs will not exceed what a "prudent" and cost-conscious buyer would pay for a given item or service. (Medicare Provider Reimbursement Manual, Part I, HCFA Pub. No. 15-1, § 2102.1, <http://www.hcfa.gov/pubforms/pub151/pub__15__1.htm> [as of Dec. 14, 2000].)

53-54.)[6] The PPS rate and adjustments are not static. PPS rate adjustments are the subject of HHS's annual rulemaking process, at which time rate adjustments are based in large part on the annual cost reports prepared by all Medicare providers and filed with their intermediaries for audit and review. (See *Your Home Visiting Nurse Services, Inc. v. Shalala, supra,* 525 U.S. at p. 451 [119 S.Ct. at pp. 932-933]; 42 C.F.R. § 413.20(b); Medicare Provider Reimbursement Manual, Pt. II, HCFA Pub. No. 15-2, §§ 100-106, <http://www.hcfa.gov/pubforms/pub152/pub_152_2.htm> [as of Dec. 14, 2000]; and see *Fundamentals, supra,* pp. 45-46.) This is one use of the cost reports that are the subject of this lawsuit.

### 3.

Cost reports are also used to calculate reimbursement for cost-based providers (a use that has apparently diminished over time as Medicare has moved to other reimbursement methodologies but nevertheless still exists). Under the cost-reimbursement methodology, providers are reimbursed according to either the claims submitted by the provider or the provider's annual cost report, or by a combination of both. (*Fundamentals, supra,* p. 55.) Here and for all purposes, a provider's "reasonable costs" are defined by Medicare as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services [as] determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs . . . ." (42 U.S.C. § 1395x(v)(1)(A).)

"Reasonable costs" include some, but not all, of the direct and indirect costs that are incurred by providers in the delivery of patient care to Medicare beneficiaries. (42 C.F.R. § 412.2(c)-(f).) The calculation and reporting of "reasonable costs" are highly regulated and very, very technical. By way of a few examples, every provider cost report must include a "chart of accounts, definitions, principles, and statistics" as prescribed by the regulations. (42 U.S.C. §§ 1320a(a), 1395x(v)(1)(F).) Recordkeeping requirements are imposed on the providers, and there are rules governing the provider's internal apportionment of costs. (*Fundamentals, supra,* pp. 59-60; 42 C.F.R.415.172.) There are different cost reporting requirements for (among others) proprietary facilities (42 U.S.C. § 1395x(v)(1)(B)), teaching hospitals (42 U.S.C. § 1395x(v)(1)(C)), physicians providing inpatient medical services (42 U.S.C. § 1395x(v)(1)(D)), skilled nursing facilities

---

[6]According to the Union's complaint, CHW (itself and through subordinate corporations) provides inpatient, outpatient, nursing, psychiatric, and home health care services throughout California.

(42 U.S.C. § 1395x(v)(1)(E)), other posthospital extended care services (42 U.S.C. § 1395x(v)(1)(G)), and home health agencies (42 U.S.C. § 1395x(v)(1)(H)).

There are several dozen prohibitions against the inclusion of specified costs, including costs incurred for union-related activities. (42 U.S.C. §§ 1395x(v)(1)(N) [union-related activities], 1395x(v)(1)(O) [depreciation and interest on capital indebtedness and return on equity capital], 1395x(v)(1)(Q) [medical educational activities].) HCFA's own publication—the two-volume Provider Reimbursement Manual (HCFA Pub. Nos. 15-1, 15-2)—shows the complexity of cost reporting. Part II of the manual, which covers cost reporting (and only cost reporting), includes 38 chapters filling almost 1,000 pages with instructions and forms intended "to assist [the provider] in preparing an acceptable cost report and to minimize the need for direct contact between [the provider] and [its] intermediary." (Medicare Provider Reimbursement Manual, Pt. II, *supra*, § 1100.)[7]

4.

Under the prospective payment system, the cost-based system, and other variations on those themes, the identity of the person or entity entitled to

---

[7]One treatise describes the process this way: "For a provider under a cost reimbursement methodology, the cost report begins with all the costs the provider has incurred. Those costs not related to the care of patients or that are otherwise unallowable are removed. Next, allowable costs are allocated using a step-down cost accounting methodology to the provider's routine and ancillary departments for which charges are made. For example, depreciation costs generally are allocated by the square footage of each part of the facility; administrative costs are allocated on the basis of accumulated costs; utilities are allocated on square footage, etc. When all the costs are stepped down to the costs of the routine and ancillary departments, an allocation is made between Medicare and non-Medicare patients to determine the Medicare share. Routine cost areas, including each of the routine special care areas, are divided between Medicare and non-Medicare patients on the basis of patient days. The ancillary departments, e.g., operating room, radiology, pathology, therapy, are allocated between Medicare and non-Medicare patients on the basis of the department's charges to each group of patients. In determining this allocation, it is imperative that the provider apply a uniform charge structure to all patients. If a uniform charge structure is not applied, the Medicare intermediary will mark up the charges for patients to make the proper allocation. The product resulting from the allocation of the Medicare portion of the routine and the ancillary costs, adjusted for bad debts, deductibles, and coinsurance, is compared to the interim payments made by the intermediary to the facility. The cost report is due 90 days following the end of the provider's cost reporting year." (MacDonald et al., Treatise on Health Care Law (Matthew Bender 2000), Ch. 8, Health Care Payment Systems, § 8.06, Method of Payment.)

Another treatise discusses separately the inclusion and exclusion of such costs as personal comfort items (television, telephone and radio costs), parking facilities, billing costs, drugs and related medical supplies, taxes, insurance, start-up costs, administrative costs, corporate costs, advertising, professional organization membership costs, political and lobbying activities, deferred compensation plans, fringe benefits, language translation, renovation costs, losses, and more. (2 Medicare and Medicaid Guide, *supra*, ¶ 5852, pp. 1936-1943-9.)

reimbursement must be determined before payment or reimbursement is actually made. Almost always, Medicare Part A benefits must be paid directly to the provider and cannot be paid to the beneficiary. As a result, Part A providers must accept direct assignment of payment from Medicare and cannot charge the beneficiary any fee in excess of the Medicare program amount. (42 C.F.R. §§ 424.70-424.90.)[8] Unlike Part A beneficiaries, Medicare Part B beneficiaries may receive direct payment from Medicare or assign their benefits to their treating physician or supplier (42 C.F.R. §§ 424.53, 424.55) but Part B providers who accept assignments may not charge a beneficiary more than the Medicare deductible and coinsurance amounts. (42 U.S.C. § 1395w-4(g)(2)(C); *Fundamentals, supra*, pp. 62-63.) Subject to certain exceptions, Medicare prohibits payment for assigned benefits to anyone other than the physician or supplier who provided the services or supplies. The exceptions include payment to an employer of a physician pursuant to an employment agreement, payment to an inpatient facility for services furnished in that facility pursuant to a written agreement with a physician, payments under a reciprocal billing arrangement, payment for diagnostic test interpretations, and so on. (*Fundamentals, supra*, pp. 63-65; 42 C.F.R. §§ 424.73, 424.80.)

5.

At various stages of cost-reporting, claims and calculation, the provider may seek review of the administrative decisions that are made, but both administrative and judicial review have been limited by the Medicare statute and regulations. (See Neeley-Kvarme, *Administrative and Judicial Review of Medicare Issues: A Guide Through the Maze* (1981) 57 Notre Dame L.Rev. 1, 5; hereafter Neeley-Kvarme.) When the provider submits an annual cost report, the report is reviewed by the provider's intermediary and determinations are made about whether claimed costs are reasonable. (42 U.S.C. § 1395g(a); *Bethesda Hospital Assn. v. Bowen* (1988) 485 U.S. 399, 400-401 [108 S.Ct. 1255, 1256-1257, 99 L.Ed.2d 460]; *Wilmot Psychiatric/Medicenter Tucson v. Shalala* (9th Cir. 1993) 11 F.3d 1505, 1507.) After the intermediary performs an audit of the provider's cost report (usually, about 15 months after the year in question), the intermediary issues an NPR (that is, a notice of proposed reimbursement, which is the intermediary's determination of allowable costs, underpayment owed to the provider, or overpayment owed by the provider to the Medicare program). (42 C.F.R.

---

[8]"Assignment" is defined by Medicare as "an agreement between a physician or supplier and an enrollee. Under the terms of the assignment, enrollee transfers to the physician or supplier his right to benefits based on covered services specified on the assigned claim; the physician or supplier in return agrees to accept the approved charge determined by the carrier as his *full charge* for the items or services." (*Fundamentals, supra*, p. 62.)

§§ 405.1803(a), 413.30(c).) The provider has 180 days within which to appeal from the intermediary's determination; the dollar amount in controversy usually determines where the appeal is filed. (42 C.F.R. §§ 405.1809-405.1839, *Fundamentals, supra,* p. 65.)

If a Part A dispute involves more than $1,000 but less than $10,000, a reimbursement dispute is appealed to·the intermediary, where it is heard by a hearing officer or a panel designated by the intermediary. Intermediary decisions may be reevaluated or reopened within 12 months (or four years on a showing of good cause). Beyond that, they may be reviewed by HCFA's Administrator in his discretion. *They are not subject to judicial review.* (42 C.F.R. §§ 405.1809-405.1839, 405.750, 405.1875; Medicare Provider Reimbursement Manual, Pt. I, *supra,* §§ 2910-2918; *Fundamentals, supra,* p. 66.)

If a Part A dispute involves more than $10,000, it must be appealed to the Provider Reimbursement Review Board (the PRRB). Decisions by the PRRB may be reviewed by the HCFA Administrator and are subject to judicial review by way of a civil action filed in the federal district court—but the PRRB's or Administrator's decision will be given considerable deference. (42 U.S.C. §§ 1395ii, 405(h); 42 C.F.R. §§ 405.1835, 405.1842, 405.1873-405.1885; *Good Samaritan Hospital v. Shalala, supra,* 508 U.S. at pp. 417-418 [113 S.Ct. at pp. 2160-2162] [a court should be "especially reluctant" to reject the agency's view when it fits the design of the statute as a whole and its object and policy]; *Thomas Jefferson Univ. v. Shalala* (1994) 512 U.S. 504, 512 [114 S.Ct. 2381, 2386-2387, 129 L.Ed.2d 405] [deference should be afforded when a regulation concerns a " 'complex and highly technical regulatory program' " requiring significant expertise and entailing the exercise of judgment grounded in policy concerns]; *National Medical Enterprises, Inc. v. Sullivan* (9th Cir. 1990) 916 F.2d 542, 546; Medicare Provider Reimbursement Manual, Pt. 1, *supra,* §§ 2920-2928; *Fundamentals, supra,* pp. 66-67.) *Except as provided in the Medicare statute, "[n]o findings of fact or decision . . . shall be reviewed by any person, tribunal, or governmental agency . . . ."* (42 U.S.C. §§ 405(h), 1395ii, italics added.) At least one commentator has described this system as providing "little direct review . . . for legal issues" in the administrative context and equally limited review in the courts. (Neeley-Kvarme, *supra,* 57 Notre Dame L.Rev. at pp. 28-30.)

Part B disputes may be administratively appealed by the beneficiary or his assignee (the vast majority of Part B appeals are pursued by physicians or suppliers who have accepted assignments). (42 C.F.R. § 405.805; *Fundamentals, supra,* pp. 67-68.) In this context, a Request for Review must be

filed with the carrier or HCFA within six months after the carrier issues a Notice of Determination (which is a determination of allowable costs and an explanation of Medicare benefits sent to the beneficiary and assignee, if there is one). After a Notice of Review Determination is issued, disputes involving more than $100 can be pursued by a request for a "Fair Hearing" (at which the hearing officer is bound by HCFA's interpretation of the Medicare law, including local policies). If the dispute involves more than $500, the next step is an appeal to an administrative law judge (who is not bound by local medical review policies). The penultimate appeal is to the Departmental Appeals Board (DAB), which may decline review. Following DAB review (or a decision to decline review), a dispute involving more than $1,000 may be appealed to the federal district court. (42 U.S.C. § 1395ff; 42 C.F.R. §§ 405.801-405.877.) There is another set of rules governing Part C appeals. (*Fundamentals, supra,* pp. 68-71.)[9]

6.

Private persons or groups (such as the Union), concerned that a provider has claimed costs that ought not to have been claimed, have recourse under federal law.

The Medicare statutes make it a felony for a provider to intentionally make false statements of material facts in seeking to obtain any payment. (42 U.S.C. § 1320a-7b(a); 42 C.F.R. § 455.2.) HCFA's Medicare Intermediary Manual (HCFA Pub. No. 13-3, § 3951) instructs its "intermediary fraud units" about several dozen Medicare fraud schemes, including "cost report fraud" such as "including costs of noncovered services, supplies, or equipment in allowable costs," "[b]illing Medicare for costs not incurred or which were attributable to nonprogram activities, other enterprises, or personal expenses," "[r]epeatedly including unallowable cost items on a provider's cost report except for purposes of establishing a basis for appeal," and so on. (See <http://www.hcfa.gov/medicare/fraud/39fraud2.htm> [as of Feb. 5, 2001].) As the Medicare Intermediary Manual explains, all available sources may be used to identify "potential areas for review" in search of Medicare fraud, including "[c]omplaints or questions from providers, beneficiaries, Medicaid recipients, or private citizens . . . ." (Medicare Intermediary Manual, HCFA Pub. No. 13-3, § 3956,<http://www.hcfa.gov/medicare/fraud/39fraud2.htm>

[9]During the three decades that the Medicare program has been in existence, the United States Supreme Court "has generally shown a reluctance to interfere with the processes under which Medicare is governed, insisting strictly on exhaustion of administrative remedies and severely restricting judicial review of program decisions. Substantively, the Court has, with rare exceptions, deferred to HCFA's interpretation both of the statutes that govern Medicare and also of its own regulations." (Jost, *supra,* 51 Admin. L.Rev. at pp. 45-46.)

[as of Feb. 5, 2001].) To that end, "[c]omplaints may be presented by telephone, in writing, or in person." (*Id.,* § 3966.) The intermediary has the power to disallow improper costs (*Cabarrus County Home Health Agency v. Palmetto Government Benefits Administrator* (Mar. 23, 2000) PRRB Dec. No. 2000-D31 [2000 WL 394177] and, subject to due process considerations, to revoke the provider's right to treat Medicare beneficiaries.

In addition, a complaint may be made directly to HHS's Office of Inspector General (OIG), an independent unit charged with the duty to investigate suspected Medicare fraud and abuse. OIG has access to HCFA's files, records and data, as well as those of its contractors, and it has the power to withhold payments, terminate provider agreements, impose sanctions, and propose civil monetary penalties. Through criminal or civil case referrals to the Department of Justice, OIG is responsible for initiating punitive action against individual providers. (3 Medicare and Medicaid Guide, *supra,* ¶ 13,913, pp. 5629-5637.)

### 7.

According to the statute itself, "costs incurred for activities directly related to influencing employees respecting unionization may not be included" in determining reasonable costs. (42 U.S.C. § 1395x(v)(1)(N).) Although the regulations do not elaborate on this exclusion, the Provider Reimbursement Manual does. Chapter 21 of Part I of the Manual includes the following provisions:

"2180. Reimbursement for Costs Incurred in Relation to Union Activities.

"2180.1. Labor Union Organizing Activities. Reasonable costs incurred by providers in activities consistent with the National Labor Relations Act (NLRA) may represent allowable costs of operation, provided such costs are not directly related to influencing employees with respect to unionization and further provided such costs are not unreasonable in amount. *The NLRA imposes responsibilities and limitations on both management and labor. Management must have the knowledge and skill to deal with their employees and the wide range of labor relations issues in order to maintain an effective working environment. These rights and responsibilities of management encompass various activities such as written and oral communication with employees, consultations with attorneys or management advisors, and collective bargaining with union representatives. Unless the provider's activities are unauthorized or prohibited by the NLRA or these guidelines, or unless the costs incurred for such activities are unreasonable in amount or unnecessary, they will be allowable.*

"Reasonable costs incurred to keep employees informed of issues and to keep the lines of communication open between employees and employers are usually necessary and proper as they are part of normal personnel management and, therefore, may be allowable costs, provided such costs are not directly related to influencing employees with respect to unionization.

"Costs incurred for activities directly related to influencing employees respecting unionization or related to attempts to coerce employees or otherwise interfere with or restrain the exercise of employee rights under the NLRA are not allowable costs for program purposes. Such costs are unallowable whether such activities are performed directly by the provider or through an independent contractor, consultant or outside attorney.

"With respect to allowable costs for services furnished, only the reasonable portion of the total costs incurred will be considered for reimbursement purposes. Expenses which are extraordinary in amount or kind, or unreasonably exceed expenditures common in the health care field for activities related to unionization, are not allowable costs.

"Example: Reasonable costs incurred to furnish literature to employees or management personnel explaining their rights and responsibilities under the NLRA are allowable costs. Costs incurred to furnish literature designed to influence employees respecting unionization or to teach techniques for influencing employees respecting unionization are not allowable costs.

"Example: Consultants and/or attorneys retained by a provider may be needed at times to familiarize supervisors and employees with labor laws. Therefore, reasonable costs incurred by a provider in seeking legal advice or counsel specifically on union activity matters, such as informing provider management and supervisory personnel regarding their legal rights and responsibilities under the NLRA with regard to union organizing, are a necessary part of operations and are allowable costs.

"Example: Reasonable costs incurred by a provider in providing training to supervisory personnel on union activity matters which is a part of normal personnel management are necessary and proper as part of the business operations of a provider and, therefore, are allowable costs, provided such training is not designed or timed to influence employees with respect to unionization.

"Example: Provider activities which impact on wage or benefit programs, because they are designed to influence employees with respect to unionization are not related to patient care and, therefore, are not allowable costs for Medicare program purposes.

"2180.2. *Collective Bargaining.* Reasonable expenses incurred by a provider for collective bargaining and related activities, unless disallowed under § 2180.1 are allowable costs, provided the activities are permitted by the NLRA. *Contract negotiations and any procedures which flow from enforcement of contract terms, whether in a collective or individual setting, are necessary to maintain the continued operation of the provider, and, thus, are a precondition for the delivery of health services.*

"Example: The cost of the services of management's representative in good-faith collective bargaining activities is an allowable cost.

"Example: Consultants and/or attorneys fees associated with collective bargaining activities in violation of the NLRA are not allowable costs.

"2180.3. Unallowable or Allowable But Not Reasonable Costs in Relation to Union Activities. Costs incurred for activities directly related to influencing employees respecting unionization or related to attempts to coerce employees or otherwise interfering with or restraining the exercise of employee rights under the NLRA are not allowable costs for program purposes. Such costs are unallowable whether such activities are performed directly by the provider or through an independent contractor, consultant or outside attorney.

"Example: Costs incurred for activities directly related to expressing management's opinions for purposes of influencing employees not to organize and to form a union are not allowable costs.

"With respect to allowable costs for services furnished, only the reasonable portion of the total incurred costs will be considered for payment purposes where expenses are extraordinary in amount or in kind, or which unreasonably exceed expenditures common in the health care field for activities related to unionization." (Italics added.)

"2183. Legal Fees and Other Related Costs. Legal fees and related costs incurred by a provider are allowable if related to the provider's furnishing of patient care, e.g., legal fees incurred in appeals to the Provider Reimbursement Review Board and, if applicable, further appeals subsequent to a Board decision. However, legal fees and related costs incurred by a provider related to alleged civil fraud or indictment for a criminal act by the provider or its

owners, employees, directors, etc., or legal fees for certain anti-union activities (see § 2180), are not related to the furnishing of patient care and, therefore, are unallowable provider costs."[10]

8.

On two occasions, the Provider Reimbursement Review Board has addressed the unionization exclusion. In both cases, the PRRB *allowed* union-related costs that were *disallowed* by an intermediary.

In *Stanford University Hospital v. Blue Cross Assoc.* (Mar. 17, 1982) PRRB Dec. No. 82-D72, Medicare and Medicaid Guide (CCH) ¶ 31,911, a provider paid a consulting firm hired to assist the provider in the unionization process. The consultant's fee, claimed by the provider but disallowed after hearing by the provider's intermediary, was allowed by the PRRB, based on the posthearing revision of section 2180 of the Provider Reimbursement, Part 1, which stated that, "[u]nless the provider's activities are unauthorized or prohibited by the NLRA, or unless the costs incurred for such activities are unreasonable in amount or unnecessary," they are allowable.

In *St. Francis Hospital v. Blue Cross and Blue Shield* (Sept. 1, 1988) PRRB Dec. No. 88-D28, Medicare and Medicaid Guide (CCH) ¶ 37,410, the provider claimed as a reasonable cost a wage increase that had previously been found by the NLRB to constitute an unfair labor practice (because the NLRB found the increase was a promise undertaken with the express purpose of impinging upon the employees' freedom of choice about whether to unionize). The intermediary disallowed the cost, claiming its decision was supported by section 2180.1 of the 1979 edition of the Provider Reimbursement Manual, Part I, which then provided that costs " 'incurred for activities directly related to influencing employees regarding their right to organize . . . and to join an existing union are not related to patient care and, therefore, are not allowable costs.' "

On the provider's appeal, the PRRB allowed the cost: "Given our policy that reasonable costs of distributing information to employees and obtaining outside consultation with respect to union organizing activities are allowable, we have been unable to devise an administratively practicable way of distinguishing the portion of such costs incurred 'with the intent to influence

[10]The extraordinary detail included in these regulations is readily apparent from the Provider Reimbursement Manual's Tables of Contents. For example, Part I has 30 chapters. The union rules just quoted in the text are part of Chapter 21. The table of contents for Chapter 21 fills eight pages. We could go on, but we think we've made the point.

employees.' The attempt to draw such general distinctions places undue administrative burdens on fiscal intermediaries to analyze providers' motivations and allocate costs between those attributable to 'persuasion' and those attributable to 'information.'

"We have therefore decided to clarify our stated policy by revising [section] 2180.1 to acknowledge that reasonable costs incurred in connection with union organizing activities are related to patient care, including costs of informing employees of their rights and responsibilities under the NLRA, communicating management's position with respect to unionization, and obtaining advice and consultation of attorneys or consultants with respect to such activities. *Costs claimed for activities which are not authorized, or which are prohibited by the NLRA will continue to be disallowed as unreasonable and unrelated to the efficient delivery of needed health services.* Additionally, costs that are excessive or that were incurred for unnecessary management activities will not be considered reasonable and will not be reimbursable under the Medicare program." (Italics in original.)

More specifically, the PRRB found the provider's costs for the wage increase to all employees announced two weeks before a union representation election were allowable costs related to patient care because those costs were not direct costs of the unfair labor practices found by the NLRB, and there was no evidence to substantiate a claim that the costs incurred for the wage increase were costs of an unfair labor practice.[11]

## C.

█   The point of the foregoing discussion is this: Federal law governing provider cost reporting and reimbursement so thoroughly occupies the field

---

[11]In similar exercises of its curatorial review, the PRRB regularly reviews intermediary decisions concerning "reasonable cost" claims. (See *American River Hospital v. Aetna Life Insurance Company* (Jan. 4, 1995) PRRB Dec. No. 95-D14 [1995 WL 936262] [interest income and other administrative expenses]; *Menifee Valley Medical Center v. Blue Cross* (Mar. 22, 2000) PRRB Dec. No. 2000-D30 [2000 WL 394154] [intermediary correctly excluded "square footage statistics" for a "fourth floor storage area" because it was not "used for patient care purposes"]; *Bamna Home Health Care, Inc. v. Blue Cross* (Aug. 19, 1999) PRRB Dec. No. 99-D60 [1999 WL 649061] [interest expense related to unpaid employment taxes properly excluded by intermediary]; *Crestview Convalescent Center v. Blue Cross* (May 5, 1999) PRRB Dec. No. 99-D46 [1999 WL 297470] [cost of transporting provider's "lower paid worker[s]" to the provider's facility are allowable]; *Central Health Services v. Aetna Life Insurance Co.* (June 25, 1997) PRRB Dec. No. 97-D74 [1997 WL 383673] [where primary purpose of provider's radio and television advertisements was to recruit personnel and not to increase patient utilization, costs thereby incurred are allowable]; *Health Visions Home Care v. Blue Cross* (June 30, 1999) PRRB Dec. No. 99-D54 [1999 WL 649048]; *Senior's Home Health Care, Ltd. v. Blue Cross* (June 18, 1998) PRRB Dec. No. 98-D65 [1998 WL 349517] [legal fees incurred with regard to a malpractice suit are not related to patient care and not allowable].)

with its pervasive and complex regulatory system as to make reasonable the inference that Congress left no room for the states to supplement it. (*Solorzano v. Superior Court, supra,* 10 Cal.App.4th at p. 1139; see also *Smiley v. Citibank, supra,* 11 Cal.4th at p. 147.) Our conclusion that preemption was intended in this context follows necessarily from an examination of the Union's prayer for relief in juxtaposition to the foregoing rules and regulations—relief in the form of an accounting from CHW "of all expenditures on activities to influence employees regarding unionization and of the impact of such expenditures on payments received under the Medicare and Medicaid programs and from private health plans," and affirmative injunctive relief compelling CHW to "disgorge all monies which [it] acquired by means of any act found by [the trial court] to be an unlawful and/or unfair business practice under Business and Professions Code [section] 17200 et seq."[12]

In our view, no state court ought to venture into such a minefield. (*Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 338 [74 Cal.Rptr.2d 55]; *Schweiker v. Gray Panthers* (1981) 453 U.S. 34, 43 [101 S.Ct. 2633, 2639-2640, 69 L.Ed.2d 460]; *Stephenson v. Shalala* (9th Cir. 1996) 87 F.3d 350, 356 [describing Medicare as an "enormously complicated" program and observing that the "system is a web; a tug at one strand pulls on every other"].) In more prosaic terms, the Medicare statutes, regulations, manuals, and administrative decisions lead ineluctably to the conclusion that federal law so comprehensively occupies the field of Medicare provider cost reporting and reimbursement that there remains no room for state involvement. (*Carrillo v. ACF Industries, Inc.* (1999) 20 Cal.4th 1158, 1162 [86 Cal.Rptr.2d 832, 980 P.2d 386].) When Congress created the Medicare program, it recognized that it was ill-equipped to answer specific questions concerning what items and services qualified for reimbursement. For that reason, Congress granted broad discretion to HHS's Secretary to determine "reasonable costs," and the Supreme Court routinely reminds us that the Secretary's decisions are entitled to great deference. (*Thomas Jefferson Univ. v. Shalala, supra,* 512 U.S. at p. 512 [114 S.Ct. at pp. 2386-2387].) In the limited situations where the Secretary's decisions are subject to review, that review must conform to the Administrative Procedure Act. (5 U.S.C. § 706(2); *Anaheim Memorial Hosp. v. Shalala* (9th Cir. 1997) 130 F.3d 845, 849.)

---

[12]The Union says it is not asking the trial court to determine whether CHW was appropriately reimbursed. As the trial court observed, the allegations of the Union's complaint and the relief sought by the Union belie that assertion. As the trial court aptly put it, "[a] declaration as to whether or not union-related expenses claimed by CHW were for 'activities directly related to influencing employees with respect to unionization' is a determination about whether those claimed costs were reimbursable or not. In order to adjudicate this case, the court would be required to usurp the function of the responsible agencies and decide which of the union-related costs that CHW has claimed and will claim in the future are Medicare . . . reimbursable and which, if any, are not."

Any other construction of the cost reporting and reimbursement scheme would permit California's state courts to review decisions made by an intermediary or the PRRB or the Secretary. To allow that would be to disregard federal law to the contrary, and that we will not do. (42 U.S.C. § 1395ff(b)(1)(A); *Wilmot Psychiatric/Medicenter Tucson v. Shalala, supra,* 11 F.3d at p. 1507 [the intermediary, as the agent of the Secretary of HHS, determines whether a particular cost is reasonable]; 42 U.S.C. §§ 1395ii, 405(h); 42 C.F.R. §§ 405.1835, 405.1842, 405.1873-405.1877, 405.1885; cf. *Your Home Visiting Nurse Services, Inc. v. Shalala, supra,* 525 U.S. at p. 456 [119 S.Ct. at p. 935]; *Bowen v. Georgetown University Hospital, supra,* 488 U.S. at p. 210 [109 S.Ct. at pp. 210-211]; *National Medical Enterprises, Inc. v. Sullivan, supra,* 916 F.2d at p. 546; Medicare Provider Reimbursement Manual, Pt. I, *supra,* §§ 2920-2928.)[13]

II.

The Union contends that, independent of its Medicare-based claims, its Medi-Cal-based claims may be pursued under section 17200. We disagree.

First, Medi-Cal cost reporting and reimbursement is inextricably tied to Medicare cost reporting, and preempted for the reasons explained above. (42 U.S.C. § 1395x(v)(1)(N); *Doctor's Medical Laboratory, Inc. v. Connell* (1999) 69 Cal.App.4th 891, 896 [81 Cal.Rptr.2d 829] [once a state elects to participate in the Medicaid program, it is obliged to fully comply with federal statutes and regulations]; *Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751 [55 Cal.Rptr.2d 107, 919 P.2d 721] [Medi-Cal represents California's implementation of the federal Medicaid program through which the federal government provides financial assistance to states so they may furnish medical care to qualified indigent persons]; *Mission Community Hospital v. Kizer* (1993) 13 Cal.App.4th 1683, 1688-1689 [17 Cal.Rptr.2d 303] [as a Medicaid program, California's Medi-Cal program must conform to federal statutes and regulations].)

Second, to paraphrase our Supreme Court's decision in *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d

---

[13]Our conclusion that federal Medicare law preempts the field of provider cost reporting and reimbursement makes it unnecessary to consider whether a separate preemption exists under the NLRA (*San Diego Unions v. Garmon* (1959) 359 U.S. 236, 243 [79 S.Ct. 773, 778-779, 3 L.Ed.2d 775]; *Hillhaven Oakland Nursing etc. Center v. Health Care Workers Union* (1996) 41 Cal.App.4th 846, 853-854 [49 Cal.Rptr.2d 11] [when an activity is actually or arguably prohibited or protected by sections 7 or 8 of the NLRA, state courts must defer to the NLRB to avoid state interference with national labor policy]) or the False Claims Act (31 U.S.C. § 3730(b)).

509, 523 [213 Cal.Rptr. 247, 698 P.2d 150], "even if [the regulation of Medi-Cal cost reporting and reimbursement were not preempted and even if CHW's] conduct could somehow be construed as violative of federal law, state court injunctive relief under the theory of unfair competition is inappropriate. [¶] A similar question was raised in *Diaz v. Kay-Dix Ranch* (1970) 9 Cal.App.3d 588. . . . In that case, plaintiff migratory farmworkers sought an injunction prohibiting defendant ranch owners from knowingly employing illegal aliens. An action alleging unfair competition was brought under former Civil Code section 3369. [¶] The court, while recognizing the farmworkers' need for protection, denied injunctive relief on the basis that federal action through the authority of the Immigration and Naturalization Service would be more efficacious than injunctive relief. 'Plaintiffs seek the aid of equity because the national government has breached the commitment implied by national . . . policy. It is more orderly, more effectual, less burdensome to the affected interests, that the national government redeem its commitment. Thus the court of equity withholds its aid.' [Citation.]

"[Had we decided that the Union's Medi-Cal claims were not preempted, we would have] concluded that [the federal system], rather than the [state court], is the appropriate [place to enforce the Medi-Cal cost provisions]. The sound counsel of the *Diaz* decision, therefore, mandates state abstention in reliance upon federal enforcement in this case." (See also *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301-1302 [22 Cal.Rptr.2d 20] [the state courts cannot assume general regulatory powers under the guise of enforcing section 17200].)[14]

## III.

When the trial court sustained CHW's demurrer to the Union's complaint *with leave to amend,* the court issued a protective order covering all documents and other tangible items produced in discovery, with access limited to the attorneys and their support personnel "in preparation for and during the litigation of this matter." As noted at the outset, the Union elected to stand on its original complaint and a judgment of dismissal was entered. Since our rejection of the Union's arguments on the merits of its complaint puts an end

---

[14]In *Solorzano v. Superior Court, supra,* 10 Cal.App.4th at page 1148, footnote 14, in summarily rejecting an abstention claim, we said that the *Diaz* line of cases applied only when a field was "absolutely and entirely preempted by federal law." In light of our holding in the present case, that was a bit of an overstatement—but only a bit. Our willingness to apply the abstention doctrine to the Union's Medi-Cal claims follows our conclusion that the Union's Medicare-based claims alleging improper cost reporting and reimbursements are, in fact, preempted. In short, our view is that we ought to abstain with regard to the Medi-Cal claims *because* the Medicare claims are preempted.

to this litigation, the present protective order is moot. If CHW believes a postjudgment protective order is necessary, the appropriate application may be made to the trial court.

## DISPOSITION

The judgment is affirmed. The appeal from the protective order is dismissed as moot. CHW is awarded its costs of appeal.

Ortega, Acting P. J., and Mallano, J., concurred.